Argued and submitted September 26, 2008, resubmitted en banc June 17, affirmed
December 23, 2009

## STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

## MARY LOU CERVANTES,
*Defendant-Respondent.*

Deschutes County Circuit Court
05FE0735ST; A130129

223 P3d 425

Jonathan H. Fussner, Assistant Attorney General, argued the cause for appellant. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Mary Shannon Storey, Deputy Public Defender, argued the cause for respondent. With her on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Before Brewer, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Schuman, Ortega, Rosenblum, Sercombe, Judges, and Carson, Senior Judge.

BREWER, C. J.

Edmonds, J., dissenting.

**BREWER, C. J.**

In this pretrial appeal, the state assigns error to the trial court's allowance of defendant's demurrers to three charges: causing another person to ingest a controlled substance, *former* ORS 475.984 (2003), *renumbered as* ORS 475.908 (2005); unlawful application of a controlled substance to a minor, *former* ORS 475.986 (2003), *renumbered as* ORS 475.910 (2005); and recklessly endangering another person, ORS 163.195.[1] As explained below, the state is not in a position to obtain reversal as to the first two charges. As to the third charge, recklessly endangering another person, we conclude that the trial court properly allowed defendant's demurrer. Accordingly, we affirm the trial court's decision.

As pertinent to the issues raised on appeal, the indictment provided:

"(Count 1 - ORS 475.984) That the said defendant, on or about the 19th day of July 2004, in Deschutes County, Oregon, did knowingly cause another person to ingest, other than by administering or dispensing, a controlled substance or a controlled substance analog without consent of the other person. The State further alleges that this count is a separate and distinct criminal act from all other counts. The State further alleges that the following aggravating conditions were present: deliberate cruelty was involved; there was harm or loss significantly greater than typical; a vulnerable victim was involved; the victim sustained permanent injury.

"(Count 2 - ORS 475.986) That the said defendant, on or about the 19th day of July 2004, in Deschutes County, Oregon, did unlawfully and intentionally apply METHAMPHETAMINE, a Schedule II controlled substance, to the body of [EH], a person under 18 years, by means other than

---

[1] *Former* ORS 475.984(1) provides that "[a] person commits the crime of causing another person to ingest a controlled substance if the person knowingly or intentionally causes the other person to ingest, other than by administering or dispensing, a controlled substance or a controlled substance analog without consent of the other person." *Former* ORS 475.986(1) provides that "it is unlawful for any person to intentionally apply a controlled substance to the body of another person by injection, inhalation, ingestion or any other means if the other person is under 18 years of age." ORS 163.195(1) provides that "[a] person commits the crime of recklessly endangering another person if the person recklessly engages in conduct which creates a substantial risk of serious physical injury to another person."

injection, inhalation or ingestion[.] The State further alleges that this count is a separate and distinct criminal act from all other counts. The State further alleges that the following aggravating conditions were present: deliberate cruelty was involved; there was harm or loss significantly greater than typical; a vulnerable victim was involved; the victim sustained permanent injury.

"(Count 3 - ORS 163.195) That the said defendant, on or about the 19th day of July 2004, in Deschutes County, Oregon, did unlawfully and recklessly create a substantial risk of serious physical injury to [EH] BY INGESTING METHAMPHETAMINE THAT WOULD BE PASSED TO [EH] UPON HER BIRTH[.] The State further alleges that this count is a separate and distinct criminal act from all other counts."

Before trial, defendant filed what she characterized as a "motion to dismiss" the first two counts, asserting that "[t]he facts, as set forth in the State's discovery, are not sufficient to convict." In particular, she argued that the state's theory of the case as to the first two counts was based on evidence that defendant ingested methamphetamine while the alleged victim, EH, was a fetus in defendant's womb and that methamphetamine was passed to the fetus via the umbilical cord and continued to be passed in the moments after EH was born but before the umbilical cord was severed. She argued that the legislature did not intend *former* ORS 475.984 or *former* ORS 475.986 to apply to such facts and that, if the legislature did so intend, those statutes are unconstitutional as applied to such facts as these under various provisions of the state and federal constitutions. Defendant also filed a demurrer to Count 3 of the indictment, arguing that, as alleged, the indictment failed to state a crime because a fetus is not a "person" for purposes of ORS 163.195 and that, if the statute did apply to the facts as alleged, it would be unconstitutional under various state and federal constitutional provisions. The state filed written responses on the merits to both of defendant's motions.

The trial court held a hearing on the motions described above, as well as additional pending motions, taking evidence that indicated that the state's theories on the first two counts were, in fact, as defendant assumed—that

defendant passed drugs to EH "during the period of time after [EH] was born and was no longer in the womb and before the umbilical cord was cut." As to the third charge, reckless endangerment, the court asked the prosecutor:

> "[A]re you saying that Count 3 requires that [defendant] provides drugs to her child after the child is born, or are you saying it was the, it was [defendant's] act of taking the drugs while the child was, was unborn and the drugs entering the child's body while it was unborn which created a substantial risk of serious physical injury to the baby after it was born?"

The prosecutor responded:

> "I think it's a little bit of both, Your Honor. Because the way the State is looking at this is that it is, she, she takes the controlled substance when the child is not a person, a person for purposes of criminal law. But those substances still, still passed, are still passed into that child upon birth before that umbilical cord is cut. * * * [T]he state has to prove that it is a person that's being placed in the risk of serious physical injury. So it has to be at the time of birth."

At that point in the hearing, the court began to consider whether it was appropriate to be looking at factual issues, noting that criminal procedure did not, in essence, provide for summary judgment procedures. Defense counsel responded by suggesting that the court did not need to decide disputed facts but could simply view the anticipated evidence in the light most favorable to the state. Both parties then proceeded to argue the merits of defendant's motions. The court then asked counsel whether the issues raised by defendant were "appropriately raised now under this pleading, which doesn't talk anything about in Counts 1 and 2, prenatal use of methamphetamine," and asked counsel for further argument on that issue.

When the court reconvened, it noted that the "motion to dismiss" filed by defendant concerning the first two charges was based on an argument that the facts as set forth in the state's discovery were not sufficient to convict, and it denied that motion, noting that it was the equivalent of

a summary judgment motion, which does not exist in criminal cases. The court went on, however, to suggest that defendant's constitutional arguments concerning those charges "can be raised by demurrer" and "probably should have been by demurrer." Defendant then moved to amend her motion and "to proceed as a demurrer to Counts 1 and 2 on the basis of the constitutional grounds as set forth and argued and laid out in the body of the memoranda." The court asked the prosecutor if she had any objection, and she responded, "Your Honor, the State has no, no objection. We have an interest in having the constitutional issues resolved here."

The court then proceeded to rule on defendant's demurrer to all three charges. Specifically, as to the first two charges, the court noted that a fetus is not a "person" under Oregon law, and that having methamphetamine in one's body is not a crime in Oregon and "only arguably becomes unlawful subsequently and then only if and when the child is born and then only if mother still has methamphetamine in their system and some of that methamphetamine passes to the newborn after the child is born and before the umbilical cord is severed." The court went on to note that crimes require a "voluntary act," ORS 161.095, that neither *former* ORS 475.984 nor *former* ORS 475.986 criminalized consuming methamphetamine, yet that was the only "voluntary act" that the state would attempt to prove. The court concluded that, instead, "it is the delivery through the umbilical cord after birth that the State attempts to punish" and that the flow of blood through an umbilical cord was not a knowing or intentional act. Thus, the court concluded, *former* ORS 475.984 and *former* ORS 475.986 were unconstitutional as applied, because "a person of reasonable intelligence would not know that these statutes prohibited defendant's alleged conduct."

As for Count 3, reckless endangerment, the court noted that the pertinent allegation in the indictment was that defendant had ingested methamphetamine that "would be passed to" EH "upon her birth." The court, based on the parties' agreement on the definition of "person" as found in ORS 163.005(3) (a "person" is one who "has been born and was alive at the time of the criminal act"), concluded that the named victim was not yet a living person when the voluntary

act (ingestion of drugs) occurred and that the named victim who was not a "person" at that time "was the only one who could possibly have been endangered, *i.e.*, for whom a risk of serious physical injury could have been created by defendant's prenatal drug use." Therefore, the court concluded, because no act was alleged to have occurred after the only possible victim became a "person," no crime was alleged.

The state appealed the court's pretrial demurrer rulings, arguing that, as a matter of substantive law, the court was incorrect. Defendant responded by arguing that, as a matter of substantive law, the court was correct. In their arguments with respect to the charges alleged in Counts 1 and 2, the parties both continue to make arguments pertaining to the facts that they expected the state to prove, rather than limiting their arguments to the facts as alleged in the indictment.

A demurrer in a criminal case is governed by ORS 135.630. That statute provides that a trial court, when considering whether to sustain a demurrer, may consider only the information alleged in the indictment:

"The defendant may demur to the accusatory instrument *when it appears upon the face thereof*:

"* * * * *

"(4) That the facts stated do not constitute an offense[.]"

(Emphasis added.) *See, e.g., State v. Morgan*, 151 Or App 750, 755, 951 P2d 187 (1997), *rev den*, 327 Or 82 (1998) ("a demurrer cannot be sustained on the basis of facts extrinsic to the indictment"); *State v. Barker*, 140 Or App 82, 84, 914 P2d 11, *rev den*, 323 Or 265 (1996) ("Defendant's argument about what he expects the state to present at trial is premature and does not provide a basis for sustaining a demurrer."); *State v. Durant*, 122 Or App 380, 382, 857 P2d 891 (1993) ("A defendant may not rely on facts extrinsic to the indictment to support his theory of invalidity."); *State v. Kurtz*, 46 Or App 617, 624, 612 P2d 749, *rev den*, 289 Or 588 (1980) ("Defendant does not contend that the indictment does not contain all the statutory requirements of the offense. To support his theory, defendant must rely on facts extrinsic to those contained in

the indictment. A demurrer cannot be sustained on that basis."); *State v. Gates*, 31 Or App 353, 356, 570 P2d 670 (1977) ("To reach [its] conclusions that the indictment was defective the court had to rely on facts not appearing on the face of the indictment. It follows that the demurrer should not have been sustained. ORS 135.630.").

Despite the limited scope of ORS 135.630, the parties urge us to consider facts that are extrinsic to the wording in Counts 1 and 2 for purposes of determining whether the trial court properly sustained defendant's demurrer. In response to a request by this court at oral argument, the parties submitted a joint memorandum of supplemental authority in which they argue that we should consider facts extrinsic to what is alleged in the indictment.

■ As explained below, we conclude that we cannot decide the issues concerning Counts 1 and 2 on the basis that the parties argued in the trial court and continue to argue on appeal. In the trial court, the court suggested—and both defendant and the state agreed—that the court should consider by way of a pretrial demurrer the constitutionality of Counts 1 and 2 in light of the evidence that the state expected to introduce at trial. It appears that neither party cited ORS 135.630 or asserted that it was inappropriate for the court to consider, in ruling on defendant's demurrer, facts other than those appearing on the face of the indictment.

On appeal, both parties continue to argue the substantive merits of their positions. Neither party has questioned whether it was appropriate for the trial court to have decided the substantive issue by way of demurrer. In their supplemental memorandum to this court concerning this issue, the parties suggest that the trial court's approach is supported by this court's decision in *State v. Gyenes*, 121 Or App 208, 855 P2d 642 (1993), and that in any event, they should be allowed to stipulate that a court can consider extrinsic facts in ruling on a demurrer.

In *Gyenes*, the issue was whether the trial court erred in dismissing charges of giving a bribe under ORS 162.015(1), because the statute on its face reached conduct that purportedly violated Article I, section 8, of the Oregon Constitution. The defendant argued that the statute was

overbroad. However, the facts that the defendant relied on to support his demurrer did not appear on the face of the indictment. We observed, in *dictum*, that it is permissible for a defendant to challenge the constitutionality of a statute by way of a demurrer if the assertion is that the statute is constitutionally overbroad and infringes on free speech rights, even if the indictment does not allege on its face that the defendant engaged in the allegedly constitutionally protected conduct. 121 Or App at 211. We held, however, that we did not need to address the defendant's constitutional challenge because the statute, contrary to the parties' arguments, did not prohibit unreported campaign contributions. *Id*. at 211-12. Thus, we concluded that, because the sole basis for the defendant's demurrer was that ORS 162.015(1) criminalized unreported campaign contributions and the statute did not proscribe that conduct, the trial court had erred in concluding that it unconstitutionally burdened the defendant's rights under Article I, section 8. 121 Or App at 213.[2]

This case presents different circumstances from those that existed in *Gyenes*. Here, the trial court based its grant of defendant's demurrer on the state's representation of what evidence it would offer at trial to prove Counts 1 and 2, which are alleged in the wording of the underlying statutes. In light of the legislature's codification of the principle that demurrers must be decided based on the information that appears on the face of a charging instrument, we decline to extend our *dictum* in *Gyenes* to this case where defendant expressly makes only as-applied constitutional challenges that do not implicate free speech concerns.

Moreover, *State v. Knutson*, 81 Or App 353, 725 P2d 407 (1986), relied on by the parties in their supplemental memorandum as authority for the proposition that parties may stipulate to have the court consider facts extrinsic to the indictment when deciding a demurrer, is not in the same posture as the present case. In *Knutson*, the trial court correctly determined that the parties' arguments, which involved an

---

[2] The concurrence in *Gyenes* argued that the majority should not have considered the defendant's constitutional overbreadth argument because it was based on facts outside the wording in the indictment and because the cases that the majority relied on involved facial challenges to a statute whose wording was incorporated into the charging instruments. 121 Or App at 213-14 (Edmonds, J., concurring).

examination of facts outside of the indictment to determine whether the statute of limitations had run, were not cognizable as a demurrer. The parties stipulated, and this court apparently accepted without questioning, that the issue could be resolved by way of a motion to dismiss. We express no opinion as to the propriety of what this court did in *Knutson*. We merely note that we do not consider our unexamined acceptance of the parties' stipulations as to legal issues in that case to permit parties in subsequent cases to stipulate that a court may decide an issue in a manner directly contrary to the provisions of a controlling statute.

In sum, the parties, both in the trial court and on appeal, have urged the courts to address, by way of a demurrer, an issue that is not properly subject to a demurrer. The dissent suggests that the parties' failure to heed ORS 135.630 "is not an impediment to our review." 232 Or App at 596 (Edmonds, J., dissenting). With all due respect, we disagree. The parties agreed in the court below with the trial court's erroneous conclusion that the arguments the parties were making were cognizable in the context of a demurrer, and they incorrectly assert on appeal that this court should affirm or reverse a trial court decision on the merits of a demurrer that the court should never have considered. In this peculiar circumstance, neither party is in the position to obtain a reversal on appeal.

This precise problem does not lend itself easily to one of our standard labels. In one sense, it is not, strictly speaking, a lack of preservation of error—the parties made the arguments below that they are making on appeal. In another sense, however, it is lack of preservation—the correct answer to the preliminary question presented in this case is that the trial court should not have reached the merits of defendant's arguments concerning Counts 1 and 2 in the context of deciding a demurrer. Neither party, in the trial court or in this court, made the argument that the trial court should not do so. Where neither party has preserved or argued a point, unless the matter is a jurisdictional one, this court is not in a position to rule in one party's favor on that point. Moreover, in this case, when the trial court suggested that a demurrer was the appropriate procedural vehicle for raising these arguments, *both* parties agreed that the trial court should

address defendant's arguments in the context of a demurrer. In that respect, both parties affirmatively invited the error that this court has identified.

■■ The dissent, relying on *Miller v. Water Wonderland Improvement District*, 326 Or 306, 951 P2d 720 (1998), concludes that we should correct the trial court's error in deciding this issue by demurrer despite the parties' joint position that no such error occurred. 232 Or App at 596 (Edmonds, J., dissenting). Our view, however, is that the state, as appellant, cannot obtain a reversal under these circumstances, because it invited the error that the trial court made. When both parties urge a trial court to commit legal error in making a ruling, neither party is in a position to benefit from that invited error and obtain a reversal of the ruling on appeal. *Accord Anderson v. Oregon Railroad Co.*, 45 Or 211, 216-17, 77 P 119 (1904) (Under the invited error doctrine, a party who "was actively instrumental in bringing it about * * * cannot be heard to complain, and the case ought not to be reversed because of it.").

 *Miller* does not undermine that basic principle. Nothing in the court's brief opinion in *Miller* (or in *Stull v. Hoke*, 326 Or 72, 948 P2d 722 (1997)) suggests that the court intended to abrogate a century of case law and eliminate the prudential doctrine that a party that invites an error may not obtain a reversal on appeal based on that error. In *Miller*, the court merely noted in passing that a party's failure to argue the applicability of the pertinent law would not prevent the court from applying the pertinent law. 326 Or at 309 n 3. Moreover, in *Stull*, the court first concluded that the general issue on appeal was sufficiently preserved under the basic preservation principles enunciated in *State v. Hitz*, 307 Or 183, 188-89, 766 P2d 373 (1988), then rejected the notion that a party's failure to make a specific argument in the Court of Appeals precluded the Supreme Court from considering the argument, stating that the court was responsible for identifying the correct interpretation of a statute. *Stull*, 326 Or at 76. As the dissent notes, the court stated in *Miller* that " 'parties may not prevent a court from noticing and invoking an applicable statute by relying on other sources of law.' " 232 Or App at 596 (quoting *Miller*, 326 Or at 309 n 3) (Edmonds, J., dissenting). In this case, both the majority and the dissent

notice and properly invoke ORS 135.630, and in fact funda-mentally agree about the limitations imposed by that stat-ute. The point on which we disagree is whether the state is entitled to prevail on appeal, based on an error that it invited the trial court to commit—and, indeed, on appeal, invites this court to commit.

The dissent also makes the superficially appealing argument that the state could not have invited the error because it has consistently taken the position, in the trial court and in this court, that defendant's demurrer to Counts 1 and 2 should not be sustained. 232 Or App at 596 (Edmonds, J., dissenting). What that assertion overlooks, however, is that the state, as appellant, invited the court to rule on the demurrer on a basis not permitted by the control-ling statute and urges us also to ignore the controlling stat-ute. The error that the state invited was not the allegedly erroneous *result* of the trial court's ruling on defendant's demurrer on Counts 1 and 2, but the erroneous consideration of the demurrer on those counts. The invited error doctrine has never been interpreted in the manner that the dissent would now suggest.

The dissent also suggests that *State v. Ferguson*, 201 Or App 261, 119 P3d 794 (2005), *rev den*, 340 Or 34 (2006), supports its proposition that the invited error doctrine does not apply in circumstances such as these. 232 Or App at 596 (Edmonds, J., dissenting). We disagree. In *Ferguson*, the defendant prevailed on a pretrial evidentiary issue, and the state wanted to appeal that ruling. 201 Or App at 263-64. The prosecutor informed the trial court that, although she was not going to dismiss the case, "under ORS 136.120, you could dismiss the case because the prosecution is unprepared for trial." *Id.* When the court asked if that would negatively affect the state's appeal rights, the prosecutor replied that it would not. *Id.* at 270. As we explained, the state was incor-rect that it could invite a dismissal under those circum-stances. *Id.* at 266-69; *accord State v. Shaw*, 338 Or 586, 113 P3d 898 (2005). Nevertheless, under the circumstances of that case, we declined to apply the invited error doctrine. We noted:

"[W]hen the trial court specifically asked if the dismissal under ORS 136.120 would adversely affect the state's pursuit of an appeal, and the prosecutor responded that it would not, the prosecutor's understanding was at least consistent with the approach that many of our * * * cases had reflected."

*Ferguson*, 201 Or App at 270. We agreed with the state that the invited error doctrine should not be applied, because a number of our cases did, in fact, suggest that the state's course of action was permissible. We stated:

"Given the uncertainties of our case law at the time, and the fact that there is no inherent unfairness to the process or to the trial court in reversing the dismissal order, we agree that the state's role in suggesting a dismissal as an appropriate procedural disposition is not invited error that estops the state from challenging both the dismissal and the suppression orders on appeal."

*Id.* at 271.

This case is significantly different from *Ferguson* in two ways. First, neither the controlling statute, ORS 136.630, nor the case law on point provides any support for the notion that the trial court had the ability to look beyond the face of the indictment in considering whether to sustain the demurrer. Second, in *Ferguson*, the putative "invited error" was not of the variety that foreclosed the ability to review the error on appeal. Here, by contrast, the dissent agrees with us that the error at issue is so fundamental that we are, in fact, unable to review the issue as framed by the parties on appeal. 232 Or App at 597 (Edmonds, J., dissenting). In that circumstance, where the invited error is such that it cannot be addressed in substance on appeal, there simply is no basis for permitting a party that invited the error to prevail on its assignment of error concerning that error on appeal.

No cognizable exception to the invited error doctrine applies in these circumstances. The state does not argue that the trial court committed "plain error" in deciding the demurrer issue in violation of ORS 135.630, and because the court's decision on the merits of the demurrer did not create a jurisdictional problem, there is no basis for this court to reverse

the decision of the trial court. *Cf. State v. Terry,* 333 Or 163, 185, 37 P3d 157 (2001), *cert den,* 536 US 910 (2002) (alleged defect in pleading did not deprive the trial court of jurisdiction; court could not consider matter in the first instance on appeal unless it constituted "plain error"); *State v. Caldwell,* 187 Or App 720, 724, 69 P3d 830 (2003), *rev den,* 336 Or 376 (2004) ("preservation requirements apply to a challenge to the failure of an indictment to allege an offense").

In sum, the state is not in a position to obtain reversal on Counts 1 and 2. It asks this court to decide the merits of a demurrer based on facts not properly before the trial court. Moreover, because the state is precluded from taking a position (and in fact does not take the position) that facts extrinsic to the indictment were not properly before the trial court, it cannot prevail on appeal on its assignments of error relating to those counts, either on the ground set out by the dissent, or on the ground that it asserts on appeal. Accordingly, we reject the state's assignments of error pertaining to Counts 1 and 2.

We turn to defendant's demurrer to Count 3 of the indictment. As pertinent here, that count alleged:

> "That the said defendant, on or about the 19th day of July 2004, in Deschutes County, Oregon, did unlawfully and recklessly create a substantial risk of serious physical injury to [EH] BY INGESTING METHAMPHETAMINE THAT WOULD BE PASSED TO [EH] UPON HER BIRTH[.]"

(Uppercase in original.) Defendant demurred to that count on the ground that the facts alleged failed to constitute the crime of reckless endangerment as provided in ORS 163.195.[3] The trial court agreed. For the reasons explained below, we affirm the trial court's ruling.

■■ This court reviews a trial court's ruling on a demurrer to a charging instrument for errors of law. *State ex rel Juv. Dept. v. Aragorn,* 189 Or App 65, 72, 73 P3d 939, *rev den,*

---

[3] Defendant's demurrer, the trial court's ruling, and the state's appeal of the allowance of the demurrer to Count 3 of the indictment do not present any procedural issues such as those presented in regard to Counts 1 and 2.

336 Or 192 (2003). In this case, we consider whether the relevant conduct alleged in Count 3—again, that defendant "did unlawfully and recklessly create a substantial risk of serious physical injury to [EH] BY INGESTING METHAMPHETAMINE THAT WOULD BE PASSED TO [EH] UPON HER BIRTH"—fell within the scope of the conduct that the legislature intended to prohibit by enacting ORS 163.195. We determine the statute's intended meaning in that regard according to the interpretive method set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P3d 1143 (1993), as modified by subsequent amendments to ORS 174.020 and by *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). We first examine the text and context of the statute, as well as any relevant legislative history that the parties have offered; if those inquiries do not resolve the issue, we apply relevant maxims of statutory construction. *See, e.g.*, *State v. Daline*, 175 Or App 625, 631-32, 30 P3d 426 (2001) (in considering whether facts alleged constituted crime charged, court construed applicable statutory provisions to determine scope of offense statute). In considering whether defendant's conduct as alleged fell within the ambit of the statute, we evaluate that conduct solely as it is alleged in Count 3 and do not consider any facts extrinsic to the charged offense. *Id.* at 628.

ORS 163.195 provides:

"(1) A person commits the crime of recklessly endangering another person if the person recklessly engages in conduct which creates a substantial risk of serious physical injury to another person.

"(2) Recklessly endangering another person is a Class A misdemeanor."

For the purpose of the issue presented in this case, ORS 163.195 requires that a defendant (1) recklessly engage in conduct that (2) creates a substantial risk of (3) serious physical injury to another person. For clarity of analysis, we refer to the "serious physical injury" aspect of the third element as the "harm" required under the statute. The disputed issue in this case is whether, by ingesting methamphetamine (conduct that defendant does not dispute having committed), defendant created a "risk" of that harm to "another person."

582

■ This court previously has ascertained that, for the purpose of ORS 163.195, the noun "risk" refers to " 'the *possibility* of loss, injury, disadvantage, or destruction' or 'something that creates or suggests a *hazard* or adverse *chance* : a dangerous element or factor.' " *State v. Mojarro-Sandoval*, 208 Or App 178, 144 P3d 996, *rev den*, 342 Or 117 (2006) (quoting *Webster's Third New Int'l Dictionary* 1961 (unabridged ed 2002) (emphasis added)). Based on those plain meanings, we understand the legislature's use of the word "risk" to indicate that the relevant harm need only be possible or potential; it need not actually occur. Moreover, in instances in which the harm does in fact occur, it need not do so immediately, but may do so at some later time. Thus, depending on the nature of a defendant's reckless risk-creating conduct—for example, firing a weapon into the air, leaving a campfire unattended, or leaving a hazardous substance in a public place—the "temporal" zones of danger implicated by particular forms of risk-creating conduct may vary. And, the same is true of the "spatial" zone of danger created by particular risk-creating conduct; depending, again, on the nature of that conduct, that danger zone may extend, once the risk of harm is created, to locations more or less remote from the location of the conduct itself.[4]

■ The question then becomes whether, at the time that a defendant engages in the risk-creating conduct, both aspects of the third element of ORS 163.195—both the harm and the relevant category of victim—must exist and be available for possible or potential realization of the risk. As a matter of grammar—the legislature's use of the present tense verb "creates"—as well as ordinary principles of criminal liability, and notwithstanding the temporal and spatial elasticity encompassed in the legislature's use of the term "risk," we conclude that, at the time that the defendant creates the risk,

---

[4] As to the temporal or spatial remoteness of potential resulting harm, we note that the creation of a risk by particular conduct and the potential resulting harm nearly always are separated in time and space. For example, even the harm caused by a speeding bullet does not occur at precisely the same moment as the moment at which the gun was fired; the fact that the delay may be infinitesimal does not mean that it is absent altogether. Thus, most harm resulting from reckless risk-creating conduct occurs after at least some lapse of time from the creation of the risk of that harm; likewise, most harm occurs at some spatial remove, however minimal, from such conduct.

his or her conduct must, *at that moment*, create both the possibility of serious physical injury and the possibility of that injury being inflicted—whether immediately or at some later time—on "another person." That is, regardless of whether the harm of which a risk is created is of a type that typically has the potential of occurring almost immediately (firing a weapon on a crowded street) or is one that typically has the potential of occurring at some time later (leaving an unattended campfire), and whether the harm is of a type that is relatively limited in its spatial scope (again, firing a weapon) or is capable of relatively widespread diffusion (improper disposal of airborne toxic materials in a windy location), all aspects of the potential consequence—notwithstanding that it may never actually occur—must be created by the conduct or otherwise be in existence at that time. Stated yet another way, the defendant's creation of the risk contemplated by the legislature—including the existence of the relevant category of potential victim—must be complete at the time that the defendant engages in the risk-creating conduct.

The dissent agrees that ORS 163.195 encompasses and criminalizes conduct that creates a risk of harm to a person who "later becomes endangered" or "later enter[s] the zone of danger." 232 Or App at 605 (Edmonds, J., dissenting) (emphasis added). The dissent notes that, at the time that ORS 163.195 originally was enacted, it was intended to encompass the conduct previously captured by, among other criminal offense statutes, *former* ORS 166.560 (1969), *repealed by* Or Laws 1971, ch 743, § 432. That statute provided for the offense of unlawfully leaving in a place accessible to children any discarded refrigerator that could not be opened from the inside. The dissent reasons that the statute "obviously" was intended to address risks of harm that persisted beyond the time at which the refrigerator originally was discarded and risks of harm that endangered persons who were not within the danger zone at that time. 232 Or App at 606 (Edmonds, J., dissenting). The dissent concludes that it therefore is reasonable also to infer that, in enacting ORS 163.195, the legislature would have intended to protect a child "at the time of his or her birth" from the risk of injury caused by a mother's prenatal ingestion of methamphetamine. *Id.* (Edmonds, J., dissenting).

The dissent's reasoning is sound as to all but its final conclusion. As discussed above, we agree that ORS 163.195 and similar prohibitions on risk-creating conduct apply regardless of whether any person is within the danger zone at the time that the defendant commits the conduct. And, we agree that it is not necessary for the *particular* person, if any, who eventually comes into the danger zone to have existed at the time that the defendant committed the risk-creating conduct. Rather, we agree that ORS 163.195, as well as similar current and former statutes, apply even if the particular person who eventually comes into that zone or actually is injured had not even been born when the defendant committed the relevant conduct.

It does not follow, however, that such statutes apply when, at the time that a defendant commits the relevant risk-creating conduct, there are no persons at all, anywhere, who are in existence and capable of potentially coming into the zone of danger created by that particular risk-creating act. To the contrary; as discussed above, there must be some such person in existence, somewhere, at the time the risk is created and who therefore has at least the potential, at that time, to be harmed. Only if that requirement is met, is the crime complete—regardless of how long the possibility of harm may endure; when, if ever, a contemplated victim comes within the spatial danger zone; and when, if ever, the possibility of harm results in actual harm. Conversely, if no person having the potential to be harmed exists at the time that the defendant commits the risk-creating conduct, the defendant's conduct simply does not, and cannot, constitute a crime of the nature of ORS 163.195, *former* ORS 166.560 (1969), and similarly structured offenses.

That is the case here. Here, defendant's alleged risk-creating conduct, by its nature, had the potential, *at the time that she engaged in the conduct,* to harm only an entity that was within the spatial boundaries of her physical body. Of course, that harm was not required to occur immediately; as discussed, the risk of harm contemplated by ORS 163.195 can be a risk of delayed harm. Nevertheless, at the time that defendant created that risk, it was necessary that the entity, if any, within the resulting danger zone be within the category of victim identified by the legislature. Neither the state

nor the dissent contends that, for the purpose of ORS 163.195, a fetus who has not yet been born is a "person." Because a conviction under ORS 163.195 requires a defendant to have engaged in conduct that, at the time of engaging in the conduct, created a risk of serious injury defendant to "another person," the indictment in this case failed to allege facts sufficient to constitute that crime.

█ Previous cases involving convictions for recklessly endangering another person as provided in ORS 163.195—including the legislative history of the statute as discussed in one of those cases—also are consistent with that understanding. *See State v. McDonnell*, 343 Or 557, 563, 176 P3d 1236 (2007) (context includes prior case law interpreting and applying statute). In *State v. Harbert*, 155 Or App 137, 963 P2d 710, *rev den*, 327 Or 554 (1998), the defendant fired a total of 15 rounds from two weapons into the ceiling and front door of his home. At trial, he moved for a judgment of acquittal on the ground that the state had failed to establish that any person had been within the range of the gunshots and therefore had failed to prove that anyone was endangered. *Id.* at 139. On appeal, we considered the text of the statute and commentary prepared by the Criminal Law Revision Commission and concluded that the statute "prohibits conduct that is likely to expose another person to harm; it is not limited to conduct that actually exposes another person to harm." *Id.* at 140-41 (citing Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report 97 (July 1970)).[5] We noted that, in that case, although there was no evidence that any persons were actually within range of the gunshots, there was evidence that

> "[t]he shots penetrated the door. Directly outside was a public street and neighboring residences. A jury reasonably could conclude beyond a reasonable doubt on those facts

---

[5] As we noted in *State v. Lonergan*, 210 Or App 155, 163, 149 P3d 1215 (2006), *rev'd on other grounds*, 344 Or 15, 176 P3d 374 (2008), the Commentary to the Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report (July 1970), "although not itself dispositive, offers some useful guidance in resolving" questions regarding the proper interpretation and application of Oregon's criminal offense statutes.

that defendant's conduct created a substantial risk that persons outside the house could be seriously injured."

*Id.* at 141. Thus, we reasoned that, although evidence was lacking that any specific person was within the spatial danger zone, that zone was one in which persons ordinarily could be found. *See also Mojarro-Sandoval*, 208 Or App at 182-83 (ORS 163.195 "prohibits conduct that is likely to expose another person to harm"; where the evidence established that the defendant drove while intoxicated, the passengers in his truck were placed at risk of harm); *State v. Sumerlin*, 139 Or App 579, 585-86, 913 P2d 340 (1996) (comparing offenses of reckless driving and reckless endangerment; among other distinctions, the former requires proof of endangering "the safety of persons or property," whereas the latter requires the creation of "a substantial risk of serious physical injury to another *person*" (emphasis in original)). *Cf. State v. White*, 346 Or 275, 286, 211 P3d 248 (2009) (construing statute providing for crime of second-degree robbery; explaining that the legislature's concern with the increased threat to the victim caused by the *"potential* assistance of another person" was reflected in the element of the robber being "aided by another person *actually present"* (emphasis added)).[6]

---

[6] The overwhelming majority of other courts that have considered the issue presented in this case have reached the same result, albeit under different rationales reflecting each state's pertinent statutory scheme and decision-making methodology. *See, e.g., State v. Geiser*, 763 NW2d 469 (ND 2009) (holding a fetus is not a child under the statutes criminalizing child endangerment where mother had overdosed on prescription drugs while 29 weeks pregnant); *Kilmon v. State*, 905 A2d 306 (Md 2006) (interpreting reckless endangerment statute to not apply to umbilical delivery of controlled substances, following what the court called "this nearly universal view" and noting that to allow prosecution for ingestion of drugs might also allow prosecution for other, lawful activity that could be proven harmful to the fetus); *State v. Gray*, 584 NE2d 710 (Ohio 1992) (statute prohibiting creation of substantial risk to health or safety of child not applicable to abuse of drugs during pregnancy); *State v. Aiwohi*, 123 P3d 1210 (Haw 2005) (manslaughter statute not applicable; court recognizes that "overwhelming majority of the jurisdictions confronted with the prosecution of a mother for her own prenatal conduct, causing harm to the subsequently born child, refuse to permit such prosecutions"); *Com. v. Welch*, 864 SW2d 280 (Ky 1993) (legislature did not intend criminal child abuse statute to apply to prenatal "self-abuse" that caused drugs to be transmitted through umbilical cord to unborn child); *Sheriff v. Encoe*, 885 P2d 596 (Nev 1994) (child endangerment statute does not apply to pregnant woman's ingestion of illegal substances and transmission of substances from mother to newborn through umbilical cord); *Reyes v. Superior Court*, 141 Cal Rptr 912 (Cal App 1977) (child endangerment statute not applicable to ingestion of heroin during pregnancy); *People v. Morabito*, 151 Misc 2d 259, 580 NYS 2d 843 (City Ct 1992) (child

We emphasize that, because of the unique facts presented in this case, our holding is narrow. Here, defendant did not create a risk of harm "to another person," because, at time of her conduct, there was no person in existence within the spatial zone of danger who potentially could be harmed. It may be a rare case indeed in which the zone in which the risk of harm applies will be so circumscribed. But here— where the only entity that possibly could be endangered was not a "person" at the time of defendant's culpable behavior— defendant did not create a risk of serious injury to another person. For that reason, the trial court correctly allowed defendant's demurrer to Count 3.

 Finally, to the extent that the text of ORS 163.195 is ambiguous and that its text, context, and the legislative history discussed above do not definitively resolve the question, we note that at least one canon of statutory construction counsels in favor of our interpretation of the statute. We assume that the legislature did not intend an unreasonable result. *State v. Vasquez-Rubio*, 323 Or 275, 282-83, 917 P2d 494 (1996); *State v. Rodriguez*, 217 Or App 24, 33-34, 175 P3d 471 (2007); *see also PGE*, 317 Or at 612 (at third level of statutory construction analysis, court attempts to discern what the legislature would have intended had it considered the particular problem presented). On that point, the reasoning of the Maryland Court of Appeals in *Kilmon v. State*, 905 A2d 306 (Md 2006), is instructive. There, the court held that Maryland's reckless endangerment statute, which is similar to ORS 163.195(1), could not be applied to a pregnant woman who ingested controlled substances before the birth of her child.[7] In rejecting the state's contrary argument, the court explained:

> "Notwithstanding occasional flights of fancy that may test the proposition, the law necessarily and correctly

---

endangerment statute not applicable to pregnant woman's ingestion of cocaine); *Collins v. State*, 890 SW2d 893 (Tex App 1994) (reckless injury statute not applicable).

[7] That statute, Md Code Ann, Criminal Law, § 3-204, provides, in part:

"Prohibited

"(a) A person may not recklessly:

"(1) engage in conduct that creates a substantial risk of death or serious physical injury to another[.]"

presumes that Legislatures act reasonably, knowingly, and in pursuit of sensible public policy. When there is a legitimate issue of interpretation, therefore, courts are required, to the extent possible, to avoid construing a statute in a manner that would produce farfetched, absurd, or illogical results which would not likely have been intended by the enacting body. * * *

"Keeping in mind that recklessness, not intention to injure, is the key element of the offense, if, as the State urges, the statute is read to apply to the effect of a pregnant woman's conduct on the child she is carrying, it could well be construed to include not just the ingestion of unlawful controlled substances but a whole host of intentional and conceivably reckless activity that could not possibly have been within the contemplation of the Legislature—everything from becoming (or remaining) pregnant with knowledge that the child likely will have a genetic disorder that may cause serious disability or death, to the continued use of legal drugs that are contraindicated during pregnancy, to consuming alcoholic beverages to excess, to smoking, to not maintaining a proper and sufficient diet, to avoiding proper and available prenatal medical care, to failing to wear a seat belt while driving, to violating other traffic laws in ways that create a substantial risk of producing or exacerbating personal injury to her child, to exercising too much or too little, indeed to engaging in virtually any injury-prone activity that, should an injury occur, might reasonably be expected to endanger the life or safety of the child. Such ordinary things as skiing or horseback riding could produce criminal liability. If the State's position were to prevail, there would seem to be no clear basis for categorically excluding any of those activities from the ambit of the statute; criminal liability would depend almost entirely on how aggressive, inventive, and persuasive any particular prosecutor might be."

*Kilmon*, 905 A2d at 311-12. The Maryland court's concerns are not idle ones, *see, e.g., State v. Deborah J.Z.*, 596 NW2d 490 (Wis App), *rev den*, 604 NW2d 570 (Wis 1999) (reversing denial of defendant's demurrer to charges of attempted first-degree intentional homicide and first-degree reckless injury based on her ingestion of alcohol during pregnancy and prior to delivering child, who presented with fetal alcohol effects),

and nothing in the dissent's construction of ORS 163.195(1) would foreclose those kinds of prosecutions.

Moreover, in the context of statutes governing the relationship of parents to their children, we have applied the "unreasonable results" canon to avoid interpreting a statute, ORS 163.205, so as to "create a *disincentive* for abusive parents to seek medical treatment for their injured children." *State v. Bordeaux*, 220 Or App 165, 175, 185 P3d 524 (2008) (emphasis in original). Similar logic applies here. A construction of ORS 163.195 that makes a pregnant woman criminally liable for recklessly creating risks of harm to her unborn child has the potential of giving a woman an incentive to terminate a pregnancy in order to avoid such liability.[8] Having employed the unreasonable results canon to avoid discouraging abusive parents from obtaining medical care for their child victims, we also employ it in order to avoid construing a statute to provide an incentive for a woman to terminate a pregnancy *solely* to avoid criminal liability.

Because we affirm the trial court on state statutory grounds, we need not address defendant's federal constitutional arguments. In light of the dissent's discussion of them, however, we offer the following observations regarding her argument based on her right, under the Fourteenth Amendment, to privacy.

Defendant's argument under the Fourteenth Amendment urges her right to be free from exposure to enhanced criminal liability based solely on the circumstance of her pregnancy; such exposure, defendant argues, impinges upon her ability to decide, free from governmental coercion, whether to become or remain pregnant. So framed, such an

---

[8] It is useful to note here that, but for the circumstance of her pregnancy, a woman would be free to recklessly engage in all manner of risk-creating behaviors. We are free to be foolish, so long as we do not create a substantial risk of serious physical injury to another person. That defendant here recklessly engaged in risk-creating behavior that was independently illegal is irrelevant to the dissent's statutory analysis. The dissent's construction of ORS 163.195 would criminalize *all* risk-creating behavior recklessly engaged in by pregnant women, *viz.*, behavior that a pregnant woman engages in while she is " 'aware of and consciously disregard[ing] a substantial and unjustifiable risk,' " 232 Or App at 601 (Edmonds, J., dissenting) (quoting ORS 161.085(9)), that that behavior could cause substantial physical injury to her unborn child.

argument fits within the contours of the right to privacy outlined by the United States Supreme Court and also may implicate the Equal Protection Clause of the Fourteenth Amendment.

As the Supreme Court has explained, the Fourteenth Amendment operates to protect the fundamental "right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v. Baird,* 405 US 438, 453, 92 S Ct 1029, 31 L Ed 2d 349 (1972). That case extended the protection for access to contraceptives recognized in *Griswold v. Connecticut,* 381 US 479, 85 S Ct 1678, 14 L Ed 2d 510 (1965), to unmarried persons, under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, on the ground that no rational basis existed for treating married and unmarried people differently in regard to their ability to use contraceptives. *Eisenstadt,* 405 US at 453-54. *Eisenstadt,* we have concluded, essentially stands for the proposition that the right to privacy embodied in the Fourteenth Amendment's liberty guarantee protects from governmental interference the "decision to prevent pregnancy, or to terminate pregnancy in an early stage * * * a decision that may be made unilaterally by individuals seeking to prevent conception or by a woman who wishes to terminate a pregnancy." *Does 1-7 v. State of Oregon,* 164 Or App 543, 565, 993 P2d 822 (1999), *rev den,* 330 Or 138 (2000). Where a governmental rule effects such an interference, "the Due Process Clause of the Fourteenth Amendment requires that such rules must not needlessly, arbitrarily, or capriciously impinge upon this vital area of * * * constitutional liberty." *Cleveland Board of Education v. LaFleur,* 414 US 632, 640, 94 S Ct 791, 39 L Ed 2d 52 (1974).

In *Cleveland Board of Education,* the Supreme Court held that a rule requiring mandatory maternity leave for pregnant teachers violated the Fourteenth Amendment because it "unduly penalize[d] a female teacher for deciding to bear a child." *Id.* at 648. In *Does 1-7,* by contrast, we held that a statute permitting adult adoptees to obtain access to the names of their birth parents did not unconstitutionally

infringe upon the privacy rights of mothers who relinquish their children. We reasoned that, because "a birth mother has no fundamental right to have her child adopted, she also can have no correlative fundamental right to have her child adopted under circumstances that guarantee that her identity will not be revealed to the child." 164 Or App at 565. In reaching that conclusion, we rejected the plaintiffs' argument "that allowing their adopted children access to the birth certificates * * * [would] violate[ ] the constitutional privacy rights of birth mothers because it [would] constitute[ ] an unwanted governmental intrusion into their decisions concerning whether to bear or beget children." *Id.* at 564. In light of those cases and principles, there is no question that defendant in this case has a fundamental right to decide whether to become pregnant or to carry her pregnancy to term.

Having said that, we agree with the dissent that our ability to apply relevant constitutional principles in this case would be complicated by our inability to determine from the face of the indictment precisely when defendant allegedly ingested methamphetamine in relation to the birth of EH. 232 Or App at 609 (Edmonds, J., dissenting). Because that information is not set out in the indictment, we cannot determine whether, at that time, defendant was in fact in a position to exercise her fundamental right to choose whether to bear a child.

However, the dissent's construction of ORS 163.195(1) does not differentiate between the stages of pregnancy and therefore would apply to women who recklessly create, at *any* stage of pregnancy, a risk of serious physical injury to their unborn children—and therefore would apply to defendant regardless of the point in her pregnancy at which she ingested methamphetamine. Accordingly, if the dissent's construction of ORS 163.195 were correct, defendant's Fourteenth Amendment right to privacy argument would be squarely presented despite our lack of information about the stage of pregnancy during which defendant allegedly ingested methamphetamine. Again, however, because we conclude on statutory grounds that the statute does not apply to defendant's conduct, we need not address those arguments.

In sum, the state is not entitled to reversal on appeal based on an error that both parties invited the court to commit in regard to its rulings on Counts 1 and 2. As to Count 3, ORS 163.195 does not apply to the conduct alleged therein. The trial court therefore did not err in allowing defendant's demurrers.

Affirmed.

**EDMONDS, J.,** dissenting.

The state appeals after the trial court sustained defendant's demurrers to the first three counts of the indictment returned against her by the grand jury in this case. Defendant was charged with four crimes: causing another person to ingest a controlled substance, *former* ORS 475.984 (2003), *renumbered as* ORS 475.908 (2005) (Count 1); unlawful application of a Schedule II controlled substance to a minor, *former* ORS 475.986 (2003), *renumbered as* ORS 475.910 (2005) (Count 2); recklessly endangering another person, ORS 163.195 (Count 3); and unlawful possession of a Schedule II controlled substance, *former* ORS 475.992 (2003), *renumbered as* ORS 475.840 (2005) (Count 4). On appeal, the state argues that the trial court's rulings were error. I agree with the state that the trial court erred and would reverse and remand for trial on the indictment for the reasons that follow.

I first consider the demurrer to Counts 1 and 2.[1] Pretrial, defendant filed a motion to dismiss Counts 1 and 2,

---

[1] Count 1 alleges:

"That the said defendant, on or about the 19th day of July 2004, in Deschutes County, Oregon, did knowingly cause another person to ingest, other than by administering or dispensing, a controlled substance or a controlled substance analog without consent of the other person[.]

"The State further alleges that this count is a separate and distinct criminal act from all other counts.

"The State further alleges that the following aggravating conditions were present: deliberate cruelty was involved; there was harm or loss significantly greater than typical; a vulnerable victim was involved; the victim sustained permanent injury."

Count 2 alleges:

"That the said defendant, on or about the 19th day of July 2004, in Deschutes County, Oregon, did unlawfully and intentionally apply METH-AMPHETAMINE, a Schedule II controlled substance, to the body of [EH], a person under 18 years, by means other than injection, inhalation or ingestion[.]"

asserting several as-applied constitutional challenges to the statutes on which those charges are based.[2] Defendant made no facial constitutional challenges to the statutes. Rather, she asserted that their application to her circumstances violated her procedural and substantive due process rights and the prohibitions against *ex post facto* laws and cruel and unusual punishment. At a hearing, the trial court explained to defendant that her constitutional arguments regarding Counts 1 and 2 should have been raised by demurrer and, with the state's agreement, allowed defendant to file a demurrer to Counts 1 and 2 on the same grounds as her motions to dismiss. In support of her demurrer, defendant argued to the trial court that "[t]he facts, as set forth in the State's discovery, [were] not sufficient to convict." The state countered that the statutes on which the charges were based plainly allowed for the prosecution of persons who had used controlled substances and then had passed those substances on to their infants at birth. The trial court granted defendant's demurrer to Counts 1 and 2, rulings that form the basis for the state's first two assignments of error.

The majority holds that the state invited any error that the trial court may have made as to its ruling regarding Counts 1 and 2 because the state, along with defendant, asked the trial court to consider extrinsic evidence in addition to the allegations in the counts in ruling on defendant's demurrer. It concludes that the state's assignments of error as to Counts 1 and 2 are not reviewable on that basis. I disagree that the doctrine of invited error should be applied to those assignments of error.

---

"The State further alleges that this count is a separate and distinct criminal act from all other counts.

"The State further alleges that the following aggravating conditions were present: deliberate cruelty was involved; there was harm or loss significantly greater than typical; a vulnerable victim was involved; the victim sustained permanent injury."

[2] *Black's Law Dictionary* 261 (9th ed 2009) provides the following definition of an "as-applied challenge":

"A claim that a law or governmental policy, though constitutional on its face, is unconstitutional as applied, usu. because of a discriminatory effect; *a claim that a statute is unconstitutional on the facts of a particular case or in its application to a particular party*."

(Emphasis added.)

To begin the discussion, a demurrer in a criminal case is governed by ORS 135.630. That statute provides that a trial court, when considering whether to sustain a demurrer, may consider only the information alleged in the indictment:

"The defendant may demur to the accusatory instrument *when it appears upon the face thereof*:

"* * * * *

"(4) That the facts stated do not constitute an offense[.]"[3]

(Emphasis added.) The principle that demurrers are decided on the basis of what is alleged and not on the evidence underlying the allegations is supported by a lengthy history in Oregon jurisprudence with regard to "speaking demurrers." Speaking demurrers are demurrers based on information that does not appear in the indictment. Speaking demurrers never have been legally cognizable under Oregon criminal procedure statutes that govern the scope of authority granted to trial courts regarding demurrers. *State v. Young*, 122 Or 257, 260, 257 P 806 (1927). The common law did recognize so-called special demurrers in criminal cases, but they were abolished by the adoption of the 1864 Deady Code. *State v. Nussbaum*, 261 Or 87, 91, 491 P2d 1013 (1971); *State v. Goodall*, 82 Or 329, 333, 160 P 595 (1916). In place of the common law, the legislature has repeatedly codified criminal procedures that circumscribe the authority granted to courts with respect to demurrers. *Nussbaum*, 261 Or at 91. Thus, parties to a criminal proceeding have no ability by their agreement to create a different procedure or confer authority on a trial court to use a different procedure than that authorized by statute. Clearly, the trial court erred

---

[3] Also, the Supreme Court has explained that, when a charge is alleged in statutory language, defendants are unable to assert in a demurrer that the statute is unconstitutional as applied to them:

"The indictment was written in terms of the statute, without elaboration. We thus do not know what specific operative facts the state will show, if the case is remanded for trial. It follows that, because this case arises out of the trial court's pretrial decision to sustain defendants' demurrer, defendants are unable to assert at this time that the statute is unconstitutional as applied to them."

*State v. Chakerian*, 325 Or 370, 373-74 n 4, 938 P2d 756 (1997).

when it considered extrinsic evidence in ruling on defendant's demurrer as to Counts 1 and 2.

It does not necessarily follow, however, that the trial court's error regarding its consideration of extrinsic evidence should be perpetuated by refusing to review the state's claims of error under the "invited error" doctrine. The invited error doctrine is a principle based on a policy of promoting efficient judicial administration. If the invitation of error in a trial court is intentional or strategic and proves to be unwise, a litigant "should not be allowed to blame the court for what he has himself done, and, by doing so get a second opportunity to try his case." *Crawford v. Jackson*, 252 Or 552, 555, 451 P2d 115 (1969). At the core of the principle is the understanding that a party cannot take on appeal "a position inconsistent with that which he induced the trial court to take." *Howland v. Iron Fireman Mfg. Co.*, 188 Or 230, 290, 213 P2d 177 (1949), *reh'g den,* 215 P2d 380 (1950). The purpose of the rule is not furthered by application in his case; neither party is taking a position on appeal that is inconsistent with the position that they took in the trial court. Defendant asked the trial court to grant her demurrer, and the state opposed the demurrer. On appeal, defendant asks that we affirm the trial court, and the state requests that we reverse the trial court's ruling.

But according to the majority, what the above reasoning overlooks is

> "that the state, as appellant, invited the court to rule on the demurrer on a basis not permitted by the controlling statute and urges us also to ignore the controlling statute. The error that the state invited was not the allegedly erroneous *result* of the trial court's ruling on defendant's demurrer on Counts 1 and 2, but the erroneous consideration of the demurrer on those counts."

232 Or App at 578. (Emphasis in majority.) Respectfully, the majority's reasoning makes little sense and is inconsistent with the record in the trial court. The record in the trial court reveals that it was not only the state who urged the trial court to consider extrinsic evidence. Indeed, the record is replete with indications that it was defendant who desired that the court consider extrinsic evidence and that the state acquiesced in that request in an effort to afford the trial court

a complete record on which the parties could receive a ruling regarding whether the state's theory was legally cognizable. It is only because the state ended up on the losing side of the issue in the trial court that it finds itself unable to obtain review of the trial court's rulings under the majority's reasoning. That fact has nothing to do with the goal of the invited error doctrine to prevent a party on appeal from taking a position inconsistent with that which it induced the trial court to take.

Moreover, the fact that the parties did not heed the requirement of ORS 135.630 in the trial court or in their briefing and argument to this court is not an impediment to our review. For example, in *Miller v. Water Wonderland Improvement District*, 326 Or 306, 951 P2d 720 (1998), the Supreme Court held that, even though the plaintiff never pleaded or argued in the trial court or in this court that a particular statute was controlling, that statute, nonetheless, was dispositive of the issue in the case. Pertinent to the circumstances in this case, the *Miller* court observed that "parties may not prevent a court from noticing and invoking an applicable statute by relying only on other sources of law." *Id.* at 309 n 3.

Indeed, review in this case of the state's assignments of error is consistent with this court's own case law. In *State v. Ferguson*, 201 Or App 261, 270, 119 P3d 794 (2005), we concluded that the state's role in suggesting a dismissal as an appropriate procedural disposition after the court granted the defendant's motion to suppress evidence was not invited error that prevented the state from challenging both the dismissal and the suppression orders on appeal on preservation grounds, because there was no inherent unfairness to the process or to the trial court by reviewing the state's claim of error. In that case, "everyone involved—the prosecutor, the defense attorney, and the trial court—viewed the dismissal as a complementary disposition to the suppression ruling. Everyone likewise knew that the state intended to appeal and seek a reversal." *Id.* at 270-71. The same reasoning applies here to similar circumstances; there is no inherent unfairness to the process or to the parties merely because we apply the correct standard of review to the trial court's grant of defendant's demurrer, and all that is required is to inquire

whether the allegations in the counts state facts sufficient to constitute a crime under the governing statutes.

I would conclude that the trial court erred in granting defendant's demurrer to Counts 1 and 2 in light of the limitation in ORS 135.630 that the grant of a demurrer be based only on the information that appears in the counts. Both counts allege facts in the wording of the statutes under which the charges are brought, and they do not contain any additional allegations.[4] When an indictment is alleged in the wording of the statute under which the charge is brought, the allegation is generally sufficient to withstand a defendant's demurrer. *State v. Fair*, 326 Or 485, 490, 953 P2d 383 (1998). That general rule is applicable here. Moreover, the counts alleged in the wording of the statutes permit a reasonable person to understand what is being alleged. For those reasons, the state's assertion that Counts 1 and 2 state facts sufficient to constitute criminal offenses is correct, and the trial court erred in granting defendant's demurrer as to those counts.[5]

---

[4] Count 1 alleges, in part, that "the said defendant, on or about the 19th day of July 2004, in Deschutes County, Oregon, did knowingly cause another person to ingest, other than by administering or dispensing, a controlled substance or a controlled substance analog without the consent of the other person." Count 2 alleges, in part, that "the said defendant, on or about the 19th day of July 2004, in Deschutes County, Oregon, did unlawfully and intentionally apply METHAMPHETAMINE, a Schedule II controlled substance, to the body of [EH], a person under 18 years, by means other than injection, inhalation or ingestion."

[5] On appeal, defendant argues that the trial court properly granted defendant's demurrer as to Counts 1 and 2 because the relevant statutes either are unconstitutionally vague as applied to her or are unconstitutionally overbroad as applied to her. Defendant also argues that the application of the statutes to her circumstances violates equal protection principles and that to punish defendant on these facts would be cruel and unusual. With respect to her first argument, defendant contends that she could not reasonably have known that the statutes criminalized her prenatal drug use. I understand defendant's argument to constitute a "fair warning" argument under the Due Process Clause of the Fourteenth Amendment. Our Supreme Court has described the constitutional test for statutory vagueness to be whether the statute would give a person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he or she may act accordingly. *State v. Illig-Renn*, 341 Or 228, 241, 142 P3d 62 (2006). At the time that defendant allegedly ingested methamphetamine that would be passed to her child, *former* ORS 475.908 prohibited a person from knowingly causing another person to ingest a controlled substance, and *former* ORS 475.910 prohibited a person from intentionally applying a controlled substance to the body of another person under the age of 18. In my opinion, those statutes survive a facial challenge of unconstitutional vagueness in terms of notifying a person of ordinary intelligence of what conduct is prohibited.

I turn next to Count 3. Unlike Counts 1 and 2, which allege information entirely in the wording of the statute, Count 3 of the indictment contains additional information:

"(Count 3—ORS 163.195) That the said defendant, on or about the 19th day of July 2004, in Deschutes County, Oregon, did unlawfully and recklessly create a substantial risk of serious physical injury to [EH] BY INGESTING METHAMPHETAMINE THAT WOULD BE PASSED TO [EH] UPON HER BIRTH[.]"

The trial court explained its reasoning for granting defendant's demurrer as to Count 3 in its memorandum opinion:

"Defendant last says that Count 3 fails to allege a crime because it is logically impossible for the State to convict. She relies on *State v. Downes*, 31 Or App 1183[, 572 P2d 1328] (1977). *See also State v. Daline*, 175 Or App 625[, 30 P3d 426] (2001). These cases hold that once a drug enters one's body, control over that drug is lost. That is a critical point because criminal liability, at a minimum, requires 'the performance by a person of conduct which includes a voluntary act.' ORS 161.095. The only voluntary act which the State alleges or can arguably prove is defendant's use of methamphetamine.

"The indictment alleges that the victim is a living person, [EH]. The definition of a 'person' requires that the person 'has been born and was alive **at the time of the criminal act**.' ORS 163.005(3). The indictment specifically alleges a contrary set of facts.

"The State says that it is not necessary to prove that any person was actually in the zone of danger when the reckless behavior was committed. *State v. Harbert*, 155 Or App 137[, 963 P2d 710] (1998). That may generally be the case. In this instance, that is not persuasive. First and foremost, the State has alleged a named victim, [EH]. She was not yet a living person when the voluntary act occurred. Second, [EH] was the only one who could possibly have been endangered, *i.e.*, for whom a risk of serious physical injury could have been created by defendant's prenatal drug use.

"Because no voluntary act committed after [EH's] birth is even alleged in the indictment, no crime is alleged."

(Boldface in original.)

On appeal, the parties reassert the arguments that they made to the trial court. Essentially, defendant argues that she "could admit to every fact alleged by the state [in Count 3] and still be innocent of the crime of recklessly endangering another person" because "the legislature did not intend for the statute to apply to prenatal conduct." The state responds that "[t]he plain language of the statute allows for prosecution of persons who recklessly endanger infants who receive methamphetamine at birth." I understand the state to mean that the legislature did not intend prosecutions under ORS 163.195 to be restricted to instances where the conduct and the risk that a person will be injured occur contemporaneously.

The parties' arguments present different conceptualizations about when an alleged crime is complete for purposes of ORS 163.195(1). Defendant's argument presupposes that the criminal act of recklessly endangering another was completed for purposes of this case at the time that defendant ingested methamphetamine, a point in time before her child was born. In defendant's view, it is legally irrelevant that the risk of harm caused by her ingestion of methamphetamine before her child's birth existed at a later point in time due to the passage of methamphetamine through the umbilical cord in the moments after her child's birth. The majority appears to agree with defendant's reasoning. It holds:

> "there must be some such person in existence, somewhere, at the time the risk is created and who therefore has at least the potential, at that time, to be harmed. Only if that requirement is met, is the crime complete—regardless of how long the possibility of harm may endure[.]
>
> "* * * * *
>
> "Here, defendant did not create a risk of harm 'to another person,' because, at the time of her conduct, there was no person in existence within the spatial zone of danger who potentially could be harmed."

232 Or App at 584, 587.

In contrast to defendant's argument, the state's theory focuses on two different time periods that it asserts are

alleged in Count 3. It alleges that defendant ingested meth-amphetamine on July 19, 2004, that would be passed at some later, unspecified time from defendant's body to her child's body after the child was born. Presumably, by alleging that the risk to defendant's child existed at the child's birth, the state seeks to avoid defendant's contention that the legislature did not intend for the statute to apply to her prenatal conduct, an issue that will be discussed later in this opinion.

Thus, the issue as framed by the parties' arguments is whether defendant's and the majority's interpretation of the scope of ORS 163.195(1) is what the legislature intended in 1971 when it enacted the statute or whether the state's interpretation is the correct construction of the statute.[6] To commence the task of discerning the legislature's intention in that regard, it is necessary to examine the text of the statute in its context by giving words in the statute "their plain, natural, and ordinary meaning," unless the legislature has expressly defined a word for purposes of the statute. Also, we are free to consider legislative history even if we do not perceive an ambiguity in the statute's text, if the legislative history appears useful to our analysis. *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009). The third step of the analytical construct for interpreting the legislature's intention if its intent remains unclear after examining text, context, and legislative history, is to resort to general maxims of statutory construction in an effort to resolve any remaining uncertainty.

Accordingly, I turn first to the wording of ORS 163.195(1). It provides that "[a] person commits the crime of recklessly endangering another person if the person recklessly engages in conduct which creates a substantial risk of serious physical injury to another person." The conduct of defendant alleged to be in violation of ORS 163.195(1) is defendant's conduct on July 19, 2004. According to the indictment, defendant created on that date "a substantial risk of

---

[6] The United States Supreme Court decided *Roe v. Wade*, 410 US 113, 93 S Ct 705, 35 L Ed 2d 147 (1973), after the Oregon legislature enacted ORS 163.195(1). The legislature's intent regarding ORS 163.195(1) should be discerned through a lens that predates *Roe v. Wade* and its progeny. However, the constitutionality of any application of ORS 163.195(1) under the federal constitution would, of course, take into account the subsequent developments in the law.

serious physical injury to [EH] BY INGESTING METHAM-PHETAMINE THAT WOULD BE PASSED TO [EH] UPON HER BIRTH."[7] When the word "upon" is used in the above context, it functions to "indicate a beginning course of action or an action or condition that is beginning." *Webster's Third New Int'l Dictionary* 2518 (unabridged ed 2002). The indictment does not allege when defendant's child was born, only when defendant ingested the methamphetamine that created a substantial risk of serious physical injury to the child. With respect to when the methamphetamine allegedly endangered another person, the indictment uses the word "would" in the phrase "THAT WOULD BE PASSED TO [EH] UPON HER BIRTH." The use of the word "would" in that context expresses a sense of futurity from a point of view in the past, or in the wording of Count 3, from July 19, 2004 (the date defendant allegedly ingested methamphetamine).[8] But we do not know from the allegations in the indictment whether the conduct on which the state's prosecution is based (defendant's ingestion of methamphetamine) occurred months, hours, or minutes before the birth of defendant's child.

The gravamen of the offense described in ORS 163.195(1) is a "reckless" act. "Recklessly" is defined in ORS 161.085(9), which provides as follows:

> " 'Recklessly,' when used with respect to a result or to a circumstance described by a statute defining an offense, means that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

Thus, generally, to incur criminal responsibility for a "reckless" act, the actor is required by the law to foresee the future consequences of his or her conduct. If the conduct would create a substantial and unjustifiable risk to others, and if it constitutes a deviation from the standard of care that a

---

[7] The word "passed" in the context of the indictment means "[t]o transfer or be transferred." *Black's Law Dictionary* 1233 (9th ed 2009).

[8] *See Webster's* at 2638.

reasonable person would observe, then Oregon statutes put a putative actor on notice that he or she may be held criminally responsible for harm that occurs in the future.

The "harm" that ORS 163.195(1) contemplates in the context of ORS 161.085(9), is not actual injury but the substantial risk of serious physical injury to another person. The legislature's focus on the risk of harm rather than actual injury to the victim is a further indicator of legislative intent. The ordinary meaning of the word "risk" within the context of ORS 163.195(1) refers to the "possibility" of serious physical injury.[9] A "possibility" by its inherent nature is an event that "may take place, eventuate[,]" in the future. *Webster's* at 1771. In this case, the state alleges that defendant's child was another "person" within the meaning of the statute at the point in time that she was endangered by a substantial risk of serious physical injury. Thus, the narrow issue is whether the legislature contemplated that a risk to a person in the future created by prior conduct is criminalized under the statute.

In addition to the text of ORS 163.195(1), other statutes may provide context to discern the scope intended by the legislature. Generally, for purposes of the Oregon Criminal Code promulgated in 1971, a "person" is defined, in part, as a "human being." ORS 161.015(5). For purposes of criminal homicide statutes, the legislature defines the words "human being" to mean "a person who has been born and was alive at the time of the criminal act." ORS 163.005(3). If the definition of "human being" is imported from ORS 163.005(3) into ORS 163.195(1), it could mean, as defendant argues, that the legislature intended that a person does not commit the crime of recklessly endangering another person by creating a substantial risk of serious physical injury to an unborn child because the unborn child is not a "person" for purposes of the statute.

In this case, however, the state alleges in Count 3 that defendant's child was a "person" at the time that she was exposed to a substantial risk of serious physical injury. Had the state alleged that the child was exposed to that risk only

---

[9] *See Webster's* at 1961.

while in the womb, we would be confronted with an issue that directly implicates ORS 161.015(5). But the state has elected to prosecute defendant for creating a risk that is alleged to have existed within a narrow window of time that existed after the child's birth and when she was a "person." Defendant's argument that her child was not a "person" pursuant to ORS 161.015(5) at the time that she allegedly created a risk of injury to a person gains traction only if the legislature intended to require that all the elements of ORS 163.195(1) be completed at the point in time that the conduct creating the risk occurred.

Also, part of the context of ORS 163.195(1) is ORS 161.095(1). That statute provides that "[t]he minimal requirement for criminal liability is the performance by a person of conduct which includes a voluntary act or the omission to perform an act which the person is capable of performing." ORS 161.095(1) requires us to identify the "voluntary act" for purposes of the state's allegations in Count 3 under ORS 163.195(1). The *voluntary act* alleged in Count 3 is that defendant ingested methamphetamine before the birth of her child. That allegation suffices to satisfy the minimal culpability requirement that ORS 161.095(1) imposes.

In summary, Count 3 alleges that defendant's child was "another person" for purposes of ORS 163.195(1). The time frame that the state has elected for purposes of Count 3 is a period of time, according to the indictment, that begins when defendant ingested methamphetamine and ends when her child's umbilical cord was cut. Her child was a "person" for purposes of ORS 161.015(5) during that time frame. Additionally, the allegations in Count 3 allege that defendant's conduct caused a risk of serious physical injury to her child during that time frame. The state, however, has not alleged criminal responsibility for creating any risk of injury that existed before methamphetamine would be passed to defendant's child upon her birth.[10]

---

[10] I am not aware of any legal principle that requires the state to prosecute a crime based on events that occur within a particular time frame. Rather, the state is at liberty as part of its prosecutorial function to select the time frame within which it will endeavor to prove the elements of an offense.

It would seem that, in the absence of any wording in the statute itself requiring that the conduct and the risk of serious physical injury to another person occur contemporaneously, the legislature did not intend a limitation in that regard when it enacted ORS 163.195(1). Had it intended to impose such a limitation, it could have easily expressed that requirement in the text of the statute. Nonetheless, I turn to the legislative history underlying the statute. *Gaines*, 346 Or at 172.

ORS 163.195 was enacted as part of the 1971 revision of the Oregon Criminal Code. In *State v. Garcia*, 288 Or 413, 416, 605 P2d 671 (1980), the Supreme Court traced the history of the 1971 revision of Oregon's Criminal Code:

"The 1971 legislature adopted the present kidnapping statutes as part of the complete revision of the Oregon Criminal Code. The 1967 legislature created the Oregon Criminal Law Revision Commission to revise the criminal laws of this state. Carefully kept records of the proceedings of the Commission and of its subcommittees were preserved and, accordingly, provide a rich source for determination of the drafter's intent."

(Footnote omitted.) In *State v. Lonergan*, 344 Or 15, 25 n 3, 176 P3d 374 (2008), Justice Kistler, writing for the dissent, amplified the understanding expressed in *Garcia* regarding the import of the Commission's deliberations:

"The Commission divided responsibility for drafting the revised criminal code among three subcommittees. Those subcommittees produced drafts of the code and submitted those drafts, together with commentaries on them, to the Commission, which produced a final draft of the proposed code and presented the final draft and commentary to the legislature. This court has looked to both the commentary and the discussions that preceded the adoption of the final draft as legislative history for the resulting laws."

The commentary to the section that is now codified as ORS 163.195(1) explains that the statute was intended to create a new offense that would criminalize "reckless conduct which places another person in danger of serious bodily harm." Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report

§ 96, 97 (July 1970). In the view of the commission, "[t]he statute covers potential risks as well as cases where a specific person is within the zone of danger." *Id.* The latter statement is significant in discerning the intent of the legislature; it demonstrates that the legislature contemplated criminalizing conduct that creates a risk of harm to a person who is in the zone of danger at the time of criminal conduct or who later becomes endangered because of the potential risk created by the conduct.

Other parts of the commentary also support the understanding that the legislature intended ORS 163.195(1) to criminalize conduct that creates a risk to persons who later enter the zone of danger. For example, the commentary lists several then-existing Oregon criminal statutes that were repealed because they prohibited conduct that was encompassed by ORS 163.195. Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 96, 97 (July 1970). Some examples of these statutes include permitting vicious animals to be at large, *former* ORS 166.150 (1969), *repealed by* Or Laws 1971, ch 743, § 432; and abandoning refrigerators in places accessible to children, *former* ORS 166.560 (1969), *repealed by* Or Laws 1971, ch 743, § 432. Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 96, 97 (July 1970). Those statutes criminalize conduct when, at the time the conduct occurs, there may not be any other person in the zone of danger, but the possibility exists that another person will be endangered in the future by the risk caused by the conduct.[11]

*Former* ORS 166.560 (1969) is particularly illustrative. It provided:

"It is unlawful to maintain or leave in a place accessible to children any discarded ice box, refrigerator or similar container with a door or lid attached that cannot be opened

---

[11] Other statutes replaced by ORS 163.195 involved risks that occurred contemporaneously with the conduct causing the risk; for example, dueling, *former* ORS 166.010 (1969), *repealed by* Or Laws 1971, ch 743, § 432, and throwing or shooting at a motor or railway vehicle, *former* ORS 164.530 (1969), *repealed by* Or Laws 1971, ch 743, § 432. The Commission also referenced ORS 166.320, setting spring guns or set guns, as a statute it intended to repeal, however, that statute was not repealed.

with ease from the inside. Violation of this section is a misdemeanor."

Under that former statute, the criminal conduct creating the risk of danger was the leaving of a refrigerator with a door that could not be opened from the inside in a place accessible to children. The statute was obviously intended to address risks that existed during time periods beyond when a refrigerator was abandoned. At the moment of abandonment, there may not have been any children in the zone of danger, but the conduct created a risk that children could be endangered in the future when they entered the zone of danger created by the abandonment. The examples in the commentary regarding vicious animals and spring guns contemplate similar scenarios when there may not be another person endangered at the time of the conduct creating the risk of harm but where a person is subsequently placed in danger by the conduct.[12]

Admittedly, my review of the minutes of the commission and subcommittee meetings regarding proposed versions of ORS 163.195 did not uncover any indication that the legislature expressly considered whether ORS 163.195(1) applies to circumstances where the risk was created before the victim was born. However, it is reasonable to infer from the legislature's expressed desire to protect children that it would have wanted to protect a child at the time of his or her birth from the risk of serious physical injury caused by a mother's prenatal ingestion of methamphetamine at a time when the mother consciously disregarded the risk that

---

[12] Other criminal statutes promulgated by the legislature also contemplate victims who may not have been in the zone of danger at the time of the criminal conduct. Statutes that make conduct criminal when committed with a "reckless" state of mental culpability often require, as elements of proof, events that occur at a different time than the initial act of reckless conduct. *See, e.g.*, ORS 164.325 (making it unlawful to recklessly cause serious physical injury to a firefighter or peace officer acting in the line of duty relating to a fire started by an offender intended to damage the property of the offender or another person's property); *see also* ORS 164.885 (making it unlawful to place, set, or arm an explosive device with the intent of damaging, destroying or discouraging the operation of any aircraft); ORS 164.886 (making it unlawful tree spiking that results in serious physical injury to another person). Construing ORS 163.195(1) to provide for criminal responsibility for the creation of a risk to a person who later enters the zone of danger would be consistent with the legislature's decision in other contexts to criminalize reckless conduct that has delayed effects.

methamphetamine would be passed at birth through the umbilical cord.[13] That inference is not only consistent with the language of the statute itself but also with the legislature's general policy to protect children from being subjected to reckless risks of physical harm.

Additionally, the legislature has directed us in ORS 174.010 not to insert words into a statute that do not otherwise appear therein. By its terms, ORS 163.195(1) applies to a defined universe of risks in that the legislature has provided further qualifications that the risks created by the actor subject him or her to criminal liability only if they are substantial in nature and only if they could cause serious physical injury. Had the legislature intended to criminalize conduct under ORS 163.195(1) only if the victim were a person at the time of the conduct, it could have easily provided for that kind of qualification in the same way that it imposed the qualifications that the risk be substantial and that the risk constitute a risk of serious physical injury. Essentially, the majority writes into the statute an additional qualification that finds no support in the text and the context of the statute or in its underlying legislative history. Rather, the legislative history is clear that the legislature expressly contemplated that the statute cover potential risks of harm to persons who were not in the zone of danger at the time of the risk-creating conduct without any qualification as to whether they were persons at the time of the conduct.

For all of the above-stated reasons, I would conclude that the legislature did not intend to prevent the state from obtaining a conviction under ORS 163.195(1) if it is able to prove that defendant's conduct on July 19, 2004, created a substantial risk of serious physical injury that continued to the time of the child's birth and before the child's umbilical cord was severed. It follows, in my view, that Count 3 states facts sufficient to allege a violation of ORS 163.195(1).

Additionally, the majority's reliance on the jurisprudence of other states is misplaced. For example, the majority

---

[13] It would appear that the state's theory depends in part on the dissipation rate of methamphetamine in the human body and when, in relation to the time she gave birth, defendant ingested the methamphetamine. Of course, that information is not available to us based on the allegations in the indictment.

relies in part on the reasoning in *Kilmon v. State*, 905 A2d 306 (Md 2006), where the Maryland Supreme Court held that Maryland's reckless endangerment statute was not applicable to a pregnant woman who ingested controlled substances before the birth of her child. That court was concerned with the breadth of that statute, observing that if it accepted the state's interpretation, the statute could be construed to criminalize activities such as ingesting legal drugs, consuming alcoholic beverages, smoking, failing to maintain a nutritious diet, failing to wear a seat belt, skiing, or horseback riding.

The *Kilmon* decision fails to meaningfully inform our decision for a number of reasons. First, our task is not to decide what is a reasonable or an unreasonable policy. Rather, our task as an Oregon intermediate appellate court is to apply well-settled principles of statutory interpretation to discern what the Oregon legislature would have intended, had it considered this issue. Moreover, the legislature has imposed its own limitations on the conduct that is deemed to violate the statute. For example, the state is required to prove that defendant acted "recklessly" as defined by ORS 161.085(9). To be criminally liable for a reckless act, the act must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation. Here, the risk of harm alleged by the state is narrow in scope. Under the allegations in Count 3, the state will have to prove that defendant ingested methamphetamine that would be passed from defendant's body to the victim's body at the precise moment in time between the victim's birth and the cutting of her umbilical cord. The state will have to also prove defendant's culpable mental state at the time that she ingested methamphetamine in light of the alleged risk and in accordance with the definition of recklessness under ORS 161.085(9). In other words, the statutory requirement that the state prove the culpable mental state of recklessness helps to insure that other risk-creating behavior by pregnant women will not become the subject of criminal prosecutions.

Defendant also makes alternative arguments in support of the trial court's ruling, none of which I find persuasive. First, defendant makes an as-applied vagueness challenge to ORS 163.195 under the Due Process Clause. As I

have previously noted, the allegations in Count 3 do not inform us when defendant allegedly ingested methamphetamine in relation to when her child was born. For purposes of determining whether a person of ordinary intelligence would know that his or her conduct endangers the health of another under the circumstances alleged in Count 3 depends, at least in part, on the proximity in time of defendant's ingestion of methamphetamine to the birth of the child. Absent the allegation of that fact, I would conclude that we are unable to meaningfully review defendant's constitutional challenge and that any review of this issue would have to await a more fully developed record.

Defendant also argues that applying ORS 163.195(1) to her circumstances violates her substantive due process rights because the state is "[p]rosecuting a drug-addicted pregnant woman for her choice to carry her pregnancy to term[.]" Defendant asserts that,

"[i]n the present case, the state's theory of prosecution implicates defendant's substantive due process [rights] in two respects: (1) it intrudes on an individual's decision whether to have a child; and (2) it interferes with defendant's personal autonomy during her pregnancy. Both of those matters involve intimate and personal choices central to the liberty protected by the Fourteenth Amendment."

As I understand the constitutional implications of defendant's argument, they are that the application of ORS 163.195 to the circumstances alleged in Count 3 interferes with her right of privacy and her reproductive rights under the Fourteenth Amendment to the United States Constitution. I note, however, that "[a] legislature can make a law as 'broad' and inclusive as it chooses unless it reaches into constitutionally protected ground." *State v. Blocker*, 291 Or 255, 261, 630 P2d 824 (1981).

I would conclude that, as applied to her circumstances, at least on the record before us, defendant has not demonstrated that the state infringed upon her reproductive rights when it prosecuted her under ORS 163.195(1). As the state correctly observes, it alleges that she ingested a substance that was unlawful for her to use and that would be passed on to her child upon her child's birth. There is nothing

in those allegations on their face that alleges an interference with defendant's right to become or remain pregnant or that alleges her use of methamphetamine played a role in the decision to become or remain pregnant.[14]

Defendant also argues that the application of ORS 163.195(1) to the circumstances alleged in Count 3 violates equal protection principles under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. In defendant's view, the state's theory of prosecution is aimed at a specific gender and is therefore unevenly applied. I have reviewed defendant's memoranda submitted to the trial court and observe that this issue apparently was not raised to the trial court, nor did the trial court consider the issue. I would therefore not reach it on appeal. ORAP 5.45. Moreover, I question whether such an issue is a proper ground for adjudication of a demurrer in light of the scope of the standard of review established by ORS 135.630.

Finally, defendant argues that ORS 163.195(1) violates Eighth Amendment prohibitions against cruel and unusual punishment because it punishes her for her drug addiction. She relies on *Robinson v. California*, 370 US 660, 82 S Ct 1417, 8 L Ed 2d 758 (1962), in which the Court held a statute unconstitutional because it made criminal the status of being a drug addict. The Court reasoned that applying such a law constituted cruel and unusual punishment because it targeted an illness rather than a behavior or an act. There is no allegation in Count 3 that defendant was addicted to methamphetamine at the time she allegedly ingested it. Once again, defendant's argument assumes a fact not alleged by the state in Count 3, contrary to the standard of review for demurrers imposed by the legislature.

Defendant made additional constitutional arguments to the trial court regarding all of the counts, some of which she repeats in response to the state's appeal. All her arguments suffer from infirmities that are similar to the

---

[14] To the extent that defendant argues that public policy and other Oregon laws operate to prohibit the application of ORS 163.195(1) to her circumstances, I am unaware of any statute that cannot coexist or is so inconsistent with this application that we would be required under ORS 174.020(2) to render a harmonizing construction of both statutes.

problems with review that are discussed above. Accordingly, I would decline to consider them because they are not ripe for consideration based on the record before us.

In sum, I would reverse the trial court's rulings as to the first three counts of the indictment and, for that reason, I dissent.

Carson, S. J., joins in this dissent.