888

Argued and submitted August 27, 2015, affirmed December 14, 2016

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ADAM KYLE ROGERS,
*Defendant-Appellant.*

Jackson County Circuit Court
071646FE; A154914

386 P3d 666

Shawn E. Wiley, Chief Deputy Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Ryan P. Kahn, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Carolyn Alexander, Assistant Attorney General.

Before Ortega, Presiding Judge, and Lagesen, Judge, and Haselton, Senior Judge.*

---

* Haselton, S. J. *vice* Schuman, S. J.

## HASELTON, S. J.

Defendant appeals an order denying his motion for forensic testing pursuant to ORS 138.692 (2007).[1] ORS 138.697(1).[2] Specifically, defendant contends that, in

---

[1] ORS 138.692 was amended in 2015. Or Laws 2015, ch 564, § 2. Because defendant sought, and the trial court denied, relief in 2011, those amendments are inapposite to our consideration. Consequently, all references to ORS 138.692 in this opinion are to the 2007 version of the statute, Or Laws 2007, ch 800, § 2, which was then extant. That iteration of the statute provided, in part:

"(1)(a) When a person files a motion under ORS 138.690 requesting the performance of DNA (deoxyribonucleic acid) testing on specified evidence, the motion must be supported by an affidavit. The affidavit must:

"(A)(i) For a person described in ORS 138.690(1), contain a statement that the person is innocent of the offense for which the person was convicted or of the conduct underlying any mandatory sentence enhancement; [and]

"* * * * *

"(B) Identify the specific evidence to be tested and a theory of defense that the DNA testing would support. The specific evidence must have been secured in connection with the prosecution, including the investigation, that resulted in the conviction of the person[.]

"* * * * *

"(b) *The person must present a prima facie showing that DNA testing of the specified evidence would, assuming exculpatory results, establish the actual innocence of the person of*:

"(A) The offense for which the person was convicted[.]

"* * * * *

"(2) The court shall order the DNA testing requested in a motion under subsection (1) of this section if the court finds that:

"(a) The requirements of subsection (1) of this section have been met; [and]

"* * * * *

"(d) There is a reasonable possibility that the testing will produce exculpatory evidence that would establish the innocence of the person of:

"(A) The offense for which the person was convicted[.]"

(Emphasis added.)

[2] ORS 138.697, conferring appellate jurisdiction with respect to, *inter alia,* post-judgment orders denying testing pursuant to ORS 138.692, was enacted in 2013, Or Laws 2013, ch 152, § 1, following our decision in *State v. Johnson,* 254 Or App 447, 295 P3d 677, *rev den,* 353 Or 747 (2013), which held that such orders were nonappealable. ORS 138.697 provides, in part:

"(1) A person described in ORS 138.690 may appeal to the Court of Appeals from a circuit court's final order or judgment denying or limiting DNA (deoxyribonucleic acid) testing under ORS 138.692[.]"

*See generally State v. Romero,* 274 Or App 590, 593 n 2, 360 P3d 1275 (2015), *rev den,* 358 Or 794 (2016) (addressing application of ORS 138.697(1) to orders antedating its enactment).

denying the motion, the trial court erroneously concluded that defendant had failed to "present a prima facie showing that DNA testing of the specified evidence would, assuming exculpatory results, establish [his] actual innocence of * * * [t]he offense for which [he] was convicted." ORS 138.692 (1)(b)(A). For the reasons that follow, we conclude that defendant invited any purported error in that regard. *See, e.g., State v. Cervantes*, 232 Or App 567, 577-78, 223 P3d 425 (2009); *State v. Kammeyer*, 226 Or App 210, 214, 203 P3d 274, *rev den*, 346 Or 590 (2009). Accordingly, we affirm.

The circumstances material to our consideration are straight-forward. In 2008, defendant was convicted following a jury trial of one count of first-degree rape, ORS 163.375, and one count of second-degree rape, ORS 163.365, of M, a child under the age of 14. In 2011, defendant filed a motion for forensic testing pursuant to ORS 138.692, with supporting affidavits by defendant, averring his actual innocence of the crimes of conviction, ORS 138.692(1)(a)(A)(i), and by defense counsel, pertaining to other statutory prerequisites, including description of the "theory of defense that the DNA testing would support," ORS 138.692(1)(a)(B), and the "prima facie showing that DNA testing * * * would, assuming exculpatory results, establish" defendant's "actual innocence." ORS 138.692(1)(b).

Specifically, defendant's motion asserted that the state had collected, but never tested, M's underwear and sweatpants, which, by her account, she had worn immediately before and after the charged conduct, and requested that those articles of clothing be tested to determine "if bod[ily] fluids are on them," and, if so, "whose bod[ily] fluids they are." The motion asserted:

> "If the complaining witness'[s] story was truthful[,] her panties and/or her sweatpants should have her blood and/or defendant's semen or sperm on them. The absence of blood and/or semen/sperm will either disprove the complaining witness'[s] trial testimony or [throw] the truthfulness of that testimony into doubt."

In defense counsel's affidavit, he reiterated the alleged significance of the requested testing, asserting that "a complete absence of bod[ily] fluids from defendant" on the

items of clothing "would be highly probative evidence" as contradicting M's account. As support for that contention, defense counsel referred to trial testimony by the examining pediatrician that, in cases involving tearing of the hymen, bleeding was "expected" and in approximately 50 percent of cases involving sexual penetration, DNA evidence could be obtained from the victim's clothing. Thus, the specifically identified "theory of defense that the DNA testing would support," ORS 138.692(1)(a)(B), was that a complete absence of defendant's DNA, or of M's blood, on the items of clothing would demonstrate that the crimes of conviction had never occurred.[3]

The state, in opposing the motion, contended only that defendant's submissions were legally insufficient in that they failed to satisfy ORS 138.692(1)(b). That is, the state's opposition focused solely on whether defendant had presented a "prima facie showing" that the requested testing "would, assuming exculpatory results, establish [defendant's] actual innocence." *Id.*

The practical and legal premise of the state's position was that the prosecution had not relied on DNA evidence to secure defendant's convictions—and, given the totality of evidence at trial, testing showing the absence of defendant's DNA or M's blood on the articles of clothing would not constitute *prima facie* evidence of "actual innocence." In that regard, the state recounted the evidence at trial, including M's testimony that defendant had given her marijuana and alcohol and she had heard him put on a condom before penetrating her vagina, and testimony from the examining pediatrician that M had suffered traumatic vaginal injuries, most likely as a result of a sexual assault. Further, the state emphasized that the pediatrician, while acknowledging at trial the likelihood of bleeding, had also testified that it was not uncommon for a young victim with a recently torn hymen to have little or no noticeable bleeding and that DNA evidence was not available in half of all similar sexual assault cases.

---

[3] Neither defendant's motion nor his counsel's affidavit stated that the testing could substantiate that those crimes had been committed by another person. Nor was there any representation in defendant's submissions that such a theory of defense had been advanced at trial.

Significantly, in contending that defendant had not satisfied the "prima facie showing" requirement, the state identified the applicable standard of "actual innocence" as the one set forth in *Schlup v. Delo*, 513 US 298, 329, 115 S Ct 851, 130 L Ed 2d 808 (1995): "The meaning of actual innocence * * * does not merely require a showing that a reasonable doubt exists in the light of the new evidence, *but rather that no reasonable juror would have found the defendant guilty.*" (Emphasis added.)[4]

Defendant submitted a reply memorandum. With respect to the applicable legal standard, defendant did not dispute the state's invocation of *Schlup*, but, instead, asserted that "the United [States] Supreme Court authority cited by the state * * * support[s] defendant and do[es] not support the state." Further, in addressing the substantive content of "actual innocence," defendant's reply identified *House v. Bell*, 547 US 518, 126 S Ct 2064, 165 L Ed 2d 1 (2006), as instructive. Although the reply described the circumstances and disposition of *House*, it did not explicitly refer to the Court's reiteration and amplification of the *Schlup* formulation:

> "[T]he *Schlup* standard does not require absolute certainty about the petitioner's guilt or innocence. A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt."

547 US at 538.[5]

So framed—with the sole disputed issue being whether defendant's submissions presented a "prima facie

---

[4] In *Schlup*, the Supreme Court addressed the substance of the "actual innocence" exception to the "procedural default" bar to federal habeas corpus relief. 513 US at 324-32.

[5] In *House*, the Court concluded that "had the jury heard all the conflicting testimony[,] it is more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt." 547 US at 520. Accordingly, the petitioner, who had been convicted of murder and sentenced to death in a state court prosecution, had "satisfied the gateway standard set forth in *Schlup* and may proceed on remand with procedurally defaulted constitutional claims." *Id.* at 555.

showing" of putative "actual innocence," as required by ORS 138.692(1)(b)—the matter proceeded to hearing. At the outset of that hearing, the trial court confirmed with defense counsel that the only issue was whether defendant had "establish[ed] a prima facie case of innocence." Defense counsel then, after stating that "we're in agreement that that term ("actual innocence") is a term of art that has arisen out of federal habeas proceedings," immediately referred the court to *House* as elucidating the content of that "term of art." *House* was the only authority that defense counsel invoked during the hearing, and counsel never contended, by reference to the text or context of ORS 138.692 or related statutes, that "actual innocence" for purposes of the threshold "prima facie showing" under ORS 138.692(1)(b) imported and connoted a standard other than that expounded in *House* and *Schlup*. At one point during the brief hearing, the trial court confirmed defendant's reliance on *House* as amplifying the "term of art," and later, immediately before adjourning to take the matter under advisement, the court stated, "I am going to review *House v. Bell.*"

The trial court subsequently denied the motion, concluding that defendant "has not met his burden under ORS 138.692(1)(b)(A)." That conclusion was explicitly predicated on the trial court's reliance on, and application of, the *Schlup/House* "actual innocence" formulation: The court concluded that it could not "say that it is more probable than not that *no reasonable juror could vote to convict* if faced with the evidence Defendant hopes to obtain." (Emphasis added.)

On appeal, defendant challenges that conclusion. That challenge proceeds from the premise that the trial court erred in applying the *Schlup/House* standard at the threshold "prima facie showing" stage of ORS 138.692— that is, that "[t]he court incorrectly believed that defendant was required to show that no reasonable juror would convict him given the potential results of the DNA testing." Rather, defendant contends, "the statutory scheme requires only that a defendant demonstrate a reasonable possibility that the requested testing would result in exculpatory evidence, not that defendant would prevail on retrial armed with the

results."[6] We do not understand defendant to contend that if the *Schlup/House* standard applied to *prima facie* showings under ORS 138.692(1)(b), his submissions were sufficient to satisfy that standard.

The state remonstrates, *inter alia*, that any purported error by the trial court in relying on and applying the *Schlup/House* standard was invited by defendant, compelling affirmance. The state asserts, simply, that defendant "urged the court to rely on *House*, and now complains that it did just that"—and, thus, that defendant, having been "'actively instrumental in bringing about' [the] alleged error[,] 'cannot be heard to complain[.]'" *Kammeyer*, 226 Or App at 214 (quoting *Anderson v. Oregon Railroad Co.*, 45 Or 211, 216-17, 77 P 119 (1904)).

We agree with the state. We preface our explanation by emphasizing the obvious: Our holding implies no view as to the requisite showing of "actual innocence" to satisfy the "prima facie showing" requirement of ORS 138.692 (1)(b). *Accord State v. Romero*, 274 Or App 590, 599, 360 P3d 1275 (2015), *rev den*, 358 Or 794 (2016) ("This case does not require us to establish what level of likelihood that the jury's assessment of reasonable doubt would change suffices for the required *prima facie* showing of actual innocence."). Rather, regardless of the merits of the trial court's reliance on, and application of, the *Schlup/House* standard, defendant's submissions and representations before the trial court preclude review of his appellate challenge.

Defendant, as the state asserts, was "actively instrumental in bringing about" the purported error. *Anderson*, 45 Or at 216-17. To be sure, as noted above, 282 Or App at 892, the state invoked *Schlup* first. However, thereafter in his reply memorandum, defendant not only embraced *Schlup*, arguing that it supported his position, but also invoked *House* for the first time as being instructive as "similar

---

[6] Defendant asserts that his submissions "identified the manner by which the testing of the evidence could establish his innocence: by proving that the crime did not occur, or by proving that someone else committed it." With respect, as noted above, the totality of defendant's written submissions and oral representations to the trial court discloses that his motion was predicated only on the first asserted theory of defense, without any cogent reference to the second. *See* 282 Or App at 891 n 3.

*** in that DNA testing would not provide conclusive proof that the petitioner was actually innocent." Thereafter, at the hearing, defense counsel reiterated defendant's reliance on *House*. All of those references occurred in the context in which the *only* disputed matter was the (in)adequacy of defendant's putative *prima facie* showing of "actual innocence." Defense counsel, having brought *House* to the trial court's attention and having repeatedly invoked it as elucidating "actual innocence" for purposes of assessing the sufficiency of his proffered *prima facie* submission, never suggested—not even when the court, in taking the matter under advisement, stated that it was "going to review *House v. Bell*"—that the term, as used in ORS 138.692(1)(b), might have some different, structurally or contextually informed content.

This was quintessential invited error. Neither the fact that the alleged error pertained to statutory construction nor that the state contributed to the purported error, by way of its initial citation of *Schlup*, alters that conclusion. *See State v. Hardesty*, 238 Or App 146, 151, 241 P3d 741 (2010), *rev den*, 349 Or 654 (2011) (where "[b]oth parties proceeded under a common understanding of the statutory requirements, [which] may or may not have been correct," the appellant defendant could not "now complain that the trial court erred because it failed to view the statute differently than presented by the parties"); *Cervantes*, 232 Or App at 577-78 (noting that neither *Miller v. Water Wonderland Improvement District*, 326 Or 306, 951 P2d 720 (1998), nor *Stull v. Hoke*, 326 Or 72, 948 P2d 722 (1997), "abrogate[s] a century of case law [or] eliminate[s] the prudential doctrine that a party that invites an error may not obtain a reversal on appeal based on that error," and concluding that, "[w]hen both parties urge a trial court to commit legal error in making a ruling, neither party is in a position to benefit from that invited error and obtain a reversal of the ruling on appeal").

Affirmed.