HADLOCK, P. J.
*3 Defendant appeals a judgment convicting him of second-degree child neglect, ORS 163.545, and recklessly endangering another person, ORS 163.195, after the victim, the two-year-old daughter of defendant's fiancée, found and ingested methamphetamine.[1] Defendant assigns error to the trial court's denial of his motions for judgment of acquittal on each count. In his first assignment, he contends that the court should have granted a judgment of acquittal on the child neglect charge because the state failed to show that defendant had left the victim unattended. In his second assignment, defendant asserts that the court should have granted a judgment of acquittal on the reckless endangerment charge because the state did not prove that defendant was aware of and consciously disregarded the risk that the victim would find and ingest methamphetamine. For the reasons set out below, we agree with defendant that the trial court should have granted his motion for judgment of acquittal on the child neglect charge. However, we reject his argument that he was entitled to a judgment of acquittal on the charge of reckless endangerment. Accordingly, we reverse the judgment of conviction for second-degree child neglect but otherwise affirm.
In reviewing a trial court's denial of a motion for a judgment of acquittal, we determine whether, "resolv[ing] all conflicts of evidence in favor of the state and giv[ing] the state the benefit of all reasonable inferences," the record provides sufficient evidence "from which a reasonable trier of fact could find the elements of the crime beyond a reasonable doubt." State v. Rader , 348 Or. 81, 91, 228 P.3d 552 (2010).
This case arose after J was hospitalized in September 2015. Medical personnel noted several concerns: J had an elevated heart *277 rate and high blood pressure ; she was overly excited, unable to stop moving or talking, talking rapidly, behaving repetitively; and her pupils were large.[2] *4 J's urine tested positive for methamphetamine as well as amphetamine, "which is the break down product when methamphetamine is metabolized." An examining physician, Dr. Valvano, testified that he believed "the most likely explanation, given her age and her level of symptoms, is that she ingested [the methamphetamine]" and that "the amphetamine got into her system at some point during [that Tuesday] morning."
Defendant had completed a prison term and a stay at a halfway house about a month before J was hospitalized. During that next month, defendant had lived on weekdays at the home where J lived with her eight-year-old sister and their mother, Schoenherr, who was defendant's fiancée. (He spent weekends elsewhere.) The home had an upstairs, where a full bathroom was located, and a main floor with a partial bathroom. Schoenherr, her children, and defendant slept downstairs, but at least some of the residents' clothing was kept on the upper floor. Defendant was addicted to methamphetamine and Schoenherr was a recovering addict.
Defendant and Schoenherr knew J to be a "very active" child who would eat things from the floor or garbage. A few weeks before J was admitted to the hospital, defendant had admitted to his parole officer that he had been using marijuana and "quite a bit" of methamphetamine while he was staying with Schoenherr. As a result, defendant was taken into custody in mid-September 2015 and he served a six-day jail sanction; he later described himself as having been "pretty much high the whole time" he was in jail. During a conversation with Schoenherr while serving that sanction, defendant told her that he understood it was not safe to have drugs and paraphernalia around the children. Defendant also told Schoenherr that she needed to remove a methamphetamine pipe from the house, which she found in the zipped pocket of a jacket that was in an upstairs closet. While defendant was in jail, Schoenherr deep-cleaned the home and found unused straws that could be used to sniff methamphetamine, known as "tooties," above an entertainment center.
After being released from jail, defendant stayed with his mother over the weekend, then returned to Schoenherr's *5 home on the evening of Sunday, September 27. At some point after returning to Schoenherr's, defendant used methamphetamine. When a detective later asked him if it was possible he dropped some of it, he responded, "Maybe it's possible." The day after returning to Schoenherr's, Monday, defendant had two visitors, including his friend Santoya, whom Schoenherr described as "struggling with a drug addiction," and who came by for about 45 minutes. During his visit, Santoya asked defendant if he would "keep some of [Santoya's] stuff" in the home, which defendant refused to do. Defendant told Santoya he could shower, and, other than a short conversation with defendant on the front porch, Santoya spent his visit in the upstairs bathroom. Defendant later told a detective that "there [was] a chance that [Santoya] did get high in the house." Defendant based that observation on the way Santoya was acting: "He was falling asleep when he got [to the house]. When he left he was wide awake[.]" Defendant acknowledged that he and Schoenherr did not go through the home after Santoya and the other visitor departed to "make sure they didn't leave anything there," but instead went to bed. Defendant also said that he and Schoenherr had cleaned the kitchen and living room after he returned from jail, but had not cleaned the downstairs bathroom and had not cleaned upstairs (including the bathroom where Santoya had spent time).
The next morning (Tuesday, September 29), defendant woke up at 5:45 a.m. Schoenherr, who had taken melatonin as a sleep aid,[3] slept through her 6:30 a.m. alarm, and J
*278 woke up at around 7:00 a.m. Defendant made J breakfast and J got in bed with Schoenherr. Schoenherr remained in bed-sleeping at least part of the time-until 9:30 a.m.; she remained tired after she got up.[4] While Schoenherr was in bed, defendant left J with Schoenherr both to shower and to smoke a cigarette outside. Defendant left the door open *6 while smoking and saw J and her sister go upstairs together to get clothes before the sister left for school.
When Schoenherr got out of bed, she brought J with her to the patio, so Schoenherr could smoke a cigarette, and then the two ate cookies and watched television while defendant went to the store. During that time, Schoenherr noticed that J was having trouble breathing, fidgeting, and "acting like a tweaker." When defendant returned, Schoenherr asked him if he thought that J was "acting weird." J's symptoms worsened over the next two hours and Schoenherr and defendant took her to the hospital.
Police headed to the hospital after they received information that a two-year-old child had tested positive for methamphetamine. After observing J's abnormal behavior, a police officer interviewed defendant at the hospital. He told them of Santoya's visit the night before and the chance that Santoya had used drugs in the house, saying that, if Santoya "may have left something there, may have dropped something then or whatever, that's our fuck up." Defendant denied that he might, himself, have had methamphetamine at the house that J could have accessed. However, he did acknowledge having used methamphetamine in Schoenherr's home a couple of weeks earlier. He also acknowledged that he did not know whether he might have spilled any at that time: "I mean, when you're like that you're shaking and you're-you want your fix so * * * I don't know." Schoenherr subsequently consented to a search of the home; police found no evidence of methamphetamine there.
The state ultimately charged defendant with, among other things, second-degree child neglect and recklessly endangering another person. During a trial to the court, defendant moved for a judgment of acquittal on both the neglect and reckless endangerment charges. On the neglect charge, defendant argued, among other things, that the state had failed to show that defendant had left J "unattended," as that term is used in ORS 163.545. On the reckless endangerment charge, defendant argued that the state failed to show that he was aware of and consciously disregarded a risk that J might find and ingest methamphetamine.
*7 The trial court denied defendant's motions and found defendant guilty. On appeal, defendant reprises the arguments he made below.
We begin with defendant's assertion that the trial court erred by not granting his motion for acquittal on the child neglect charge. ORS 163.545(1) defines child neglect in the second degree, a Class A misdemeanor:
"A person having custody or control of a child under 10 years of age commits the crime of child neglect in the second degree if, with criminal negligence, the person leaves the child unattended in or at any place for such period of time as may be likely to endanger the health or welfare of such child."
(Emphasis added.) Because it is dispositive, we limit our analysis to whether defendant left J "unattended" and we do not address the additional arguments he makes on appeal with regard to that charge.
Defendant argues that he did not leave J unattended because he left J in bed with Schoenherr. In response, the state argues that J was unattended because her age and behavior, combined with the presence of methamphetamine in the home, required "constant supervision," which she did not receive when defendant left her in bed with her mother.
ORS 163.545 does not define "unattended," so to discern the meaning, we look at the text and context of the statute along with relevant *279 legislative history. State v. Gaines , 346 Or. 160, 171-72, 206 P.3d 1042 (2009). When examining the text, we give words of common usage their "plain, natural, and ordinary meaning." PGE v. Bureau of Labor and Industries , 317 Or. 606, 611, 859 P.2d 1143 (1993). Webster's defines "unattended" as "not attended," "lacking a guard, escort, caretaker, or other watcher," "lacking people in attendance," "unaccompanied," "not cared for," "untended," and "not watched with care, attentiveness, or accuracy." Webster's Third New Int'l Dictionary 2482 (unabridged ed. 2002). Additionally, the parties point out that the term's meaning is discussed in the official commentary to ORS 163.545 :
*8 "The term 'unattended' means that the child is left under circumstances in which no responsible person is present to attend to his needs . Leaving a three month old child in the care of a nine year old child might, in some cases, amount to child neglect. An alleged offense under this section must be viewed as a totality of circumstances; the age of the child, place where left, whether it was left alone or in the company of others, period of time left and, finally, whether the sum of these circumstances are such as would endanger the health or welfare of the child."
Commentary to Criminal Law Revision Proposed Oregon Criminal Code, Final Draft and Report § 174, 176 (July 1970) (emphasis added).
Both the dictionary definitions and the commentary suggest that the word "unattended" is not to be construed literally as applying only when a child is completely "alone." Rather, they suggest that a child is "unattended" even when other people are present if those individuals are not responsible and capable of attending to the child's needs.
Our case law bears out that understanding of the term. We considered whether a mother left her children unattended under ORS 163.545 in State v. Forcum , 58 Or. App. 5, 646 P.2d 1356 (1982). In that case, the defendant was the mother of five children between the ages of six and 16 years old. While the defendant was grocery shopping for an hour or two, a sheriff's deputy discovered her 16-year-old son in the yard so drunk that he needed help to walk and two daughters, ages six and 11, barefoot and dirty in the house doorway, which was blocked by a broken washer and dryer. During the deputy's time at the residence and before the defendant arrived home, the other two children returned from a separate, unauthorized trip to the grocery store. Additionally, the home was in a condition that the defendant acknowledged was unsanitary and unhealthy for the children. When the defendant returned, she told the deputy that she did not know her 16-year-old was "that" drunk. Id. at 7, 646 P.2d 1356. The defendant was charged with, and convicted of, child neglect for having left her six-year-old daughter at home with the other children. We said that, despite the home's "deplorable" state, "defendant's leaving [that child] with her older brother and sisters for one to two hours while she went *9 grocery shopping cannot be described as leaving her 'unattended.' " Id. at 9, 646 P.2d 1356. We added that "[t]here was no showing that defendant's absence from the home created any greater risks than her presence."[5] Id.
We also recently addressed the meaning of "unattended," as used in a similar statutory context, in State v. Long , 294 Or. App. 192, 430 P.3d 1086 (2018). In Long , the defendant-who had a warrant for his arrest-fell asleep while driving his family, resulting in a single-car accident. Another driver witnessed the accident and stopped to assist. The defendant's girlfriend, who was injured, and their children, who were uninjured, remained in the car. After the defendant and the other driver could not free the defendant's girlfriend from the car, the other driver said he would call 9-1-1. The driver called 9-1-1 and stayed with the family until the police arrived, while the defendant hid in the trees across the road from the accident. Id. at 193, 430 P.3d 1086. The defendant was found guilty of, among other things, two counts of *280 first-degree criminal mistreatment, ORS 163.205, premised on his having left the children unattended. Id. at 193-94, 430 P.3d 1086. On appeal, the defendant contended that there was insufficient evidence to show that he had left the children unattended. Id. at 194, 430 P.3d 1086.
After considering the commentary to ORS 163.545, we held that children are not "unattended" when "a responsible person is present to attend to [their] needs." Id. at 195-96, 430 P.3d 1086. We emphasized that the state has the burden "to prove that the person [with whom the children were left] was not responsible or would not attend to them." Id. at 196, 430 P.3d 1086. Accordingly, we reversed the defendant's conviction in Long because there was "no evidence from which it could be found that [the other driver] was not a responsible person who would stay with the children and attend to them until emergency services arrived," and, therefore, the state had failed to show that the children had been left unattended. Id.
*10 Long and Forcum govern here. As construed in those cases-consistently with the dictionary definitions and legislative history cited above-the term "unattended" describes a child only if any individuals who are present are "not responsible or would not attend" to the child's needs. Long , 294 Or. App. at 196, 430 P.3d 1086.
Even assuming that Schoenherr remained asleep the entire time she was in bed before 9:30, the state did not prove that she "would not attend" to J's needs when defendant left J in Schoenherr's bed when he took a shower and smoked a cigarette. Forcum teaches that the presence even of an impaired person-there, the intoxicated 16-year-old-is sufficient to keep a child from being "unattended" if the state does not prove that the impaired person would not attend to the child's needs. Similarly here, there is no evidence that the fact that Schoenherr was asleep would have kept her from attending to J. The only fact distinguishing Schoenherr from any other sleeping parent in that regard is the evidence that she had taken melatonin and had not risen when her alarm went off. But the record includes no evidence that the melatonin that Schoenherr had taken hours earlier would have made her less responsive than any other parent who slept in.
Reduced to its core, the state's argument is that a two-year-old child always must be considered "unattended" if the child is awake and the only adult present is not-including such circumstances as when a child awakes during the middle of the night, while the rest of the household sleeps. We disagree. The state meets its burden of proving that a child-even a toddler-is unattended when left in the care of a sleeping caregiver only if the state proves that the caregiver was irresponsible or-because of being asleep-"would not" respond to the child's needs. Here, the record includes no evidence that Schoenherr "would not" awake if J, who had been placed in bed with her, became active, cried, or otherwise demonstrated that she needed attending. Accordingly, the trial court erred when it denied defendant's motion for a judgment of acquittal on the child neglect charge.
We turn to defendant's second assignment of error. He argues that the trial court erred by denying his motion *11 for a judgment of acquittal on the reckless endangerment charge because the state, by not establishing the circumstances under which J encountered and ingested the methamphetamine, did not prove beyond a reasonable doubt that defendant was aware of and consciously disregarded the risk that J might find and ingest methamphetamine. In response, the state contends that it did not need to show where in the home J ingested the methamphetamine to show that defendant was aware of and consciously disregarded the risk that the methamphetamine was accessible and that J would find it and suffer harm.
Our analysis begins with consideration of the pertinent statutes. Under ORS 163.195(1), a "person commits the crime of recklessly endangering another person if the person recklessly engages in conduct which creates a substantial risk of serious physical injury to another person." ORS 161.085(9) defines "recklessly" in the criminal context:
" 'Recklessly,' when used with respect to a result or to a circumstance described by a *281 statute defining an offense, means that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."
We have emphasized that the state need prove only conscious disregard of a substantial risk of harm; ORS 163.195(1)"prohibits conduct that is likely to expose another person to harm; it is not limited to conduct that actually exposes another person to harm." State v. Harbert , 155 Or. App. 137, 141, 963 P.2d 710, rev. den. , 327 Or. 554, 971 P.2d 410 (1998) (quoted with approval in State v. Wakefield , 292 Or. App. 694, 698, 425 P.3d 491 (2018) ). Thus, "the relevant harm need only be possible or potential." State v. Cervantes , 232 Or. App. 567, 582, 223 P.3d 425 (2009). Moreover, the risk that a defendant's conduct creates may be a risk of harm that, if it occurs, will occur at some point in the future; the risked harm need not be something that would occur simultaneously with the defendant's conduct. Id.
Here, defendant acknowledges that the record supports a finding that "either defendant, or one of defendant's *12 acquaintances with defendant's knowledge, brought methamphetamine into the home." He contends that the presence of methamphetamine in the home and the fact that J ingested it are not sufficient to establish that he acted recklessly. Instead, he contends, the state needed to establish the specific circumstances under which J encountered and consumed the drug. The state disagrees. In its view, the record is sufficient to support an inference that "defendant was aware of and consciously disregarded the risk that methamphetamine in the home was accessible, [that] J would find it," and that the child would be harmed as a result.
On this point, the state has the better argument. This is not a case in which the only evidence is that a dangerous substance was in a home and a child was harmed by ingesting that substance. Rather, in addition to those facts, the record also supports an inference that defendant knew that the manner in which methamphetamine had been used inside the home posed a substantial risk of harm to J, a toddler whom defendant knew to be active and prone to eating items that she found on the floor and in the garbage.
We note that certain circumstances are not in dispute for purposes of this appeal. The evidence supports a finding that defendant understood that methamphetamine is dangerous to children. While he was in jail, Schoenherr discussed that with him, and he told her where to find a methamphetamine pipe so she could remove it from the home. The record also supports a finding that defendant knew that J would eat things she found on the floor or in the garbage. Thus, the record allows an inference that, if defendant was aware that methamphetamine in the home was accessible to a child, it would pose a risk of serious harm to J. Indeed, defendant does not contend otherwise.
The question, then, is whether the record permits an inference that defendant was aware of and consciously disregarded a substantial risk that methamphetamine was accessible in the home. It does. Again, the evidence allows an inference that the methamphetamine that J ingested ended up in the home either when defendant used methamphetamine there, sometime in the two days preceding J's hospitalization, or when Santoya spent time in the upstairs *13 bathroom the night before J was hospitalized, emerging "wide awake" after having previously been "falling asleep." Defendant acknowledged that, in his own experience, a person who is in need of a fix can be shaky and so focused on getting a fix that he could spill methamphetamine without noticing. Defendant further acknowledged that neither he nor Schoenherr went upstairs to check the bathroom after Santoya left the house. He also admitted that the upstairs bathroom did not get cleaned after Santoya spent time there, despite defendant's recognition that Santoya might have been using methamphetamine in that room. Finally, defendant suggested that he and Schoenherr had planned to clean the downstairs bathroom the day that J was hospitalized, but had not accomplished that. *282 In short, a factfinder could determine that defendant-knowing that a visitor to his house, Santoya, may have used methamphetamine in the upstairs bathroom-did not check on the bathroom after Santoya used it, despite understanding that a person in need of a fix may be "shaking" and focused on his own needs. A factfinder also could find that defendant did not clean up the bathroom in which he had used methamphetamine himself. From that, the factfinder could conclude that, in both circumstances, defendant was aware of and consciously disregarded a substantial risk that some methamphetamine could have spilled, making it accessible to J, a "very active" toddler who had access to both bathrooms in the house. Defendant's contention that the record does not support a finding of recklessness lacks merit. The trial court did not err when it denied his motion for judgment of acquittal on the reckless endangerment charge.
Judgment of conviction for second-degree child neglect reversed; remanded for resentencing; otherwise affirmed.

Defendant was also charged with first-degree criminal mistreatment and fourth-degree assault, on which he was acquitted, as well as endangering the welfare of a minor, which the state dismissed.

J also had a forehead laceration, a burn on one arm, and "hypopigmented healed lesions over the tops of her feet" resulting from separate incidents that did not appear to be related to ingesting methamphetamine.

Dr. Valvano described melatonin as "a substance that you can buy over-the-counter or by prescription that is used to help people sleep." Schoenherr testified that "working day shifts, swing shift, and sometimes graveyard shift kinda throws your sleeping habits off," and that melatonin helps her go to sleep and sleep better.

Schoenherr testified that she had been "on and off awake" before 9:30, but she had previously told a police officer that she had been asleep.

More recently, reversing a conviction on other grounds, we declined to address a defendant's argument "based on our dictum in * * * Forcum * * * that a person's liability for the offense is contingent on proof that the person's absence enhanced the risk to the child." State v. Paragon , 195 Or. App. 265, 272, 97 P.3d 691 (2004) (emphasis in original).